**David TOMEI et al., Plaintiffs,**

v.

**Morgan M. FINLEY et al., Defendants.**

**No. 81–1715.**

United States District Court,
N. D. Illinois, E. Div.

March 30, 1981.

Supplement To Memorandum Opinion And Order—April 3, 1981.

On Motion For Injunctive Relief—
April 6, 1981.

Sheldon Gardner, George Pontikes, Foss, Schuman & Drake, Chicago, Ill., for plaintiffs.

William J. Harte, Ltd., Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Plaintiffs David Tomei and Dennis Murphy sue Morgan Finley and nine other defendants for declaratory and injunctive relief and damages. Plaintiffs moved for preliminary injunctive relief March 26, 1981 and the Court set an evidentiary hearing March 27. At the time of the hearing defendant John Walsh, the only defendant filing an appearance by counsel and attending the hearing,[1] filed a cross-motion for dismissal of the action. For the reasons stated in this memorandum opinion and order, plaintiffs' motion for injunction is granted and Walsh's motion to dismiss is denied.

---

1. Plaintiffs' counsel represented to the Court that (1) all defendants had been notified by telephone of the filing of the action and the motion for injunctive relief and (2) all or substantially all of the defendants had also been served with process before the hearing date.

## Facts [2]

Plaintiff Tomei is the duly elected Republican Committeeman for Lyons Township. That constitutes him the highest elected Republican official, holding a State of Illinois certification of office and having the right to appoint precinct captains, fill vacancies and otherwise direct the affairs of the Lyons Township Regular Republican Organization. Plaintiff Murphy is a Republican registered voter whose wife Deborah is candidate for Township Clerk on the Republican-sponsored township party in the upcoming April 7 election.

Defendant Finley (Clerk of the Circuit Court of Cook County) is Tomei's opposite number in the Lyons Township Regular Democratic Organization. All the defendants other than Finley constitute the entire slate of township candidates of the party organized and sponsored by, and formally affiliated with, the Lyons Township Regular Democratic Organization of which Finley is the Committeeman (Pl. Ex. 7). They are candidates for Township Supervisor, Clerk, Assessor, Collector, Highway Commissioner and Board of Trustees.

Because Illinois law imposes different requirements on established political "parties" than on political "committees," the regular Democratic and Republican parties do not themselves field slates in the quadrennial township elections. Instead a "new" political committee is technically formed each time—reversing the old adage by putting old wine in new bottles. Thus the 1977 Republican-sponsored and -affiliated committee in Lyons Township was dubbed the "Government of the People Party," running under the familiar GOP acronym. This year the technically new (but substantively identical) committee has been named the "Government for the People Party," exercising poetic license by using the identical GOP acronym.

Lyons Township is normally a Republican stronghold, the Republicans commanding the support of a clear majority of the voters. It was only in 1973, when the Democratic-affiliated committee adopted a name that confused the voters, that the Democrats were able to break Republican control of the township offices. Republican control resumed in 1977.

Late in December 1980 Finley and Tomei met for lunch as opposition leaders to discuss the forthcoming election. Both accepted the fact that the race would be difficult and expensive. Finley suggested that to avoid that head-to-head confrontation, the two parties (that is the Democrats and Republicans, for the "committees" that would nominally slate the candidates and conduct the election had not yet been formed) should agree on a coalition slate. Tomei said he would transmit that proposal to the Executive Committee of the Township Regular Republican Organization.

For purposes of this litigation the key part of the two-hour meeting grew out of the brief reference, in the context of the upcoming contest, to the 1973 episode referred to earlier in this opinion. Finley pointed out, in conjunction with his proposal for the coalition to avoid an all-out fight, that the Democrats could adopt as the new committee name the "Representation for Every Person Party." "Think of the REP initials," Finley chuckled. If the coalition were unacceptable, Finley said he had to win the election at any cost and that it would be a "whale of a battle with no holds barred." Tomei agreed on the prospects of battle.

After the meeting Tomei submitted the Finley coalition proposal to the Republican Executive Committee, which rejected it, and advised Finley of the rejection. On February 9, 1981 the Democrats in fact formed the "Representation for Every Person Party." They thus turned into reality what Finley had said "chuckling" in the December meeting.

---

**2.** This statement of facts is based on the sworn testimony at the evidentiary hearing, at which Walsh was represented by able counsel and also testified himself. Because of the emergency nature of the proceedings, the absence of the other defendants despite having been notified cannot be permitted to affect plaintiffs' right to preliminary injunctive relief.

Since then defendants' principal campaign thrust has been "Vote REP April 7"—that slogan permeates and dominates their literature, signs and buttons. Only a few hundred mailing pieces had been sent out at the time of the hearing, with some 60,000 ready to go. There was evidence at the hearing, principally connected with the obtaining of absentee ballots, of already-manifested voter confusion—of persons who wanted to vote for candidates they knew and whom they knew to be Republicans, or to vote for the entire Republican-supported slate, and who understood (more accurately misunderstood) that by heeding the "Vote REP" message they had seen they would be carrying out their intentions. Both that evidence and the Court's review of the exhibits reflected what the trademark infringement cases term a strong "likelihood of confusion": that Finley's carrying out of what seemed to be a jocularly mentioned possibility is having and, if not restrained, will create the desired voter confusion.[3]

### First Amendment Rights: The Right to Deceive?

■ Every judge perforce comes to the bench armed (or burdened) with his or her background and perspective. There is no legal concept better calculated to evoke an immediate response from this particular judge than the invocation of the First Amendment and its abhorrence of prior restraints.[4] Here defendants invoke both those factors, but they do not inspire the perhaps anticipated Pavlovian response. Plaintiffs too rely principally on First Amendment claims, asserting that their freedom of political association is being violated and interfered with by defendants' activities—that defendants' use of the REP acronym (universally used as "Rep." by the media to identify elected Republican officials) does not promote but rather inhibits the voters' freedom of choice.

Both counsel were asked by the Court to provide authority to deal with the availability or unavailability of injunctive relief here. Perhaps understandably given the extremely short time available to them, neither side was able to assist the Court to any substantial extent. This opinion therefore draws entirely on the Court's own research and background.

In *Garrison v. Louisiana,* 379 U.S. 64, 75, 85 S.Ct. 209, 216, 13 L.Ed.2d 125 (1964) Justice Brennan, surely as strong an advocate of First Amendment freedoms as our Supreme Court now possesses, wrote for the Court in language that might well have been written for this case:

For the use of the known lie as a tool is at once at odds with the premises of

---

**3.** Walsh's counsel seeks to minimize the evidence in this respect, pointing out that of the 400 calls to which plaintiff Murphy testified in describing his preliminary efforts to work the two precincts for which he has responsibility, "only" one in 10 or 15 voters has expressed confusion: "Who are the Republicans?" In election terms a shift of 10% of the voters is a 20% swing; a 6% shift is a 12% swing. We need look no farther back than the 1980 presidential election to recognize that what is popularly termed a "landslide" involves a much smaller swing than that. Indeed, though the evidence is sufficient to meet the test for preliminary injunctive relief, even in its absence the Court is not required to divorce itself from reality by ignoring the obvious natural effect of the "REP" campaign on the average voter, uninformed about the arcane workings of the Illinois Election Code but well aware of the recognized symbolism of major party labels.

**4.** In large part to avoid chilling the availability of representation for unpopular causes, the great legal tradition is not to identify the lawyer with the client's cause. See Justice Black's dissenting opinion in *Law Students Research Council, Inc. v. Wadmond,* 401 U.S. 154, 181, 91 S.Ct. 720, 735, 27 L.Ed.2d 749 (1971). Nonetheless the strongest objective clue to the lawyer's set of values is likely to be found in the *principles* (not the clients) with which he or she has chosen to be allied in pro bono publico activities. This is so because in those activities the lawyer is free to choose the principle, rather than the client choosing the lawyer, as in practice for hire. In those terms, full disclosure of the Court's activities before taking the bench would include serving as counsel in such First Amendment cases as *Village of Schaumburg v. Citizens for a Better Environment,* 444 U.S. 620, 100 S.Ct. 826, 63 L.Ed.2d 73 (1980); *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242 (7th Cir. 1975), *cert. denied,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976); *Cooper v. Rockford Newspapers, Inc.,* 34 Ill.App.3d 645, 339 N.E.2d 477 (2d Dist. 1975).

democratic government and with the orderly manner in which economic, social, or political change is to be effected. Calculated falsehood falls into that class of utterances which "are no essential part of any exposition of ideas, and are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality...." *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 [62 S.Ct. 766, 769, 86 L.Ed. 1031]. Hence the knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.

That still represents good law. As the majority opinion put the First Amendment goal in *First National Bank of Boston v. Bellotti*, 435 U.S. 765, 788–89, 98 S.Ct. 1407, 1422, 55 L.Ed.2d 707 (1978):

Preserving the integrity of the electoral process, preventing corruption, and "sustain[ing] the active, alert responsibility of the individual citizen in a democracy for the wise conduct of government" are interests of highest importance.

One last benchmark of the Court's application of the First Amendment to this case bears repeating. In the per curiam opinion in *Buckley v. Valeo*, 424 U.S. 1, 14–15, 96 S.Ct. 612, 632, 46 L.Ed.2d 659 (1976) the Court said:

In a republic where the people are sovereign, the ability of the citizenry to make informed choices among candidates for office is essential, for the identities of those who are elected will inevitably shape the course that we follow, as a nation. As the Court observed in *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 272 [91 S.Ct. 621, 625, 28 L.Ed.2d 35] (1971), "it can hardly be doubted that the constitutional guarantee has its fullest and most urgent application precisely to the conduct of campaigns for political office."

The First Amendment protects political association as well as political expression. The constitutional right of association explicated in *NAACP v. Alabama*, 357 U.S. 449, 460 [78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488] (1958), stemmed from the Court's recognition that "[e]ffective advocacy of both public and private points of view, particularly controversial ones, is undeniably enhanced by group association." Subsequent decisions have made clear that the First and Fourteenth Amendments guarantee " 'freedom to associate with others for the common advancement of political beliefs and ideas,' " a freedom that encompasses " '[t]he right to associate with the political party of one's choice.' " *Kusper v. Pontikes*, 414 U.S. 51, 56, 57 [94 S.Ct. 303, 307, 38 L.Ed.2d 260] (1973), quoted in *Cousins v. Wigoda*, 419 U.S. 477, 487 [95 S.Ct. 541, 547, 42 L.Ed.2d 595] (1975).

Looked at against that backdrop defendants' effort to wrap themselves in the mantle of the First Amendment must fail. They are not seeking to assure, as the Supreme Court said in a different context in *Bates v. State Bar of Arizona*, 433 U.S. 350, 384, 97 S.Ct. 2691, 2709, 53 L.Ed.2d 810 (1977), that "advertising [which is after all what defendants' use of 'REP' really is] flows both freely and cleanly." Instead they are seeking to poison the stream, to deprive voters of a free choice by diverting the intended exercise of the franchise to an unintended result.

Taking such a page from the Watergate book of "dirty tricks" is not an amusing digression but an impermissible distortion of the very principles on which defendants purport to rely. Put in the simplest terms, barring the use of the acronym "REP" is not a restraint on expression. That acronym is not the expression of ideas at all—or if it is, it is the deliberately false expression to the voters of the idea that defendants are Republicans—the "lie" that *Garrison* termed unprotected by the First Amendment. This is little different from the commercial (rather than political) false advertising held unprotected in such cases as *Bates v. State Bar of Arizona*, 433 U.S. at 381–84, 97 S.Ct. at 2707–09 and *National Commission on Egg Nutrition v. FTC*, 570 F.2d 157, 162–63 (7th Cir. 1978), *cert. denied*, 439 U.S. 821, 99 S.Ct. 86, 58 L.Ed.2d 113 (1978).

### Preliminary Injunctive Relief: Standards To Be Met

Our Court of Appeals has last year stated the tests for preliminary injunctive relief in *In re Uranium Antitrust Litigation*, 617 F.2d 1248, 1261 (7th Cir. 1980):

(1) The plaintiffs have no adequate remedy at law and will be irreparably harmed if the injunction does not issue;

(2) The threatened injury to the plaintiffs outweighs the threatened harm the injunction may inflict on the defendant;

(3) The plaintiffs have at least a reasonable likelihood of success on the merits; and

(4) The granting of a preliminary injunction will not disserve the public interest.

Each of those tests is clearly satisfied here.

All the prior discussion in this opinion has amply demonstrated plaintiffs' likelihood of success on the merits. Irreparability of harm to plaintiffs if the election were skewed by defendants' deliberately misleading efforts is self-evident, as is the fact that the harm to defendants from granting relief is only the necessary result of barring them from the prospect of improperly-obtained gains. Finally there is no question where the public interest lies.

### Conclusion

Plaintiffs are entitled to and are hereby granted a preliminary injunction under Fed.R.Civ.P. ("Rule") 65, for the reasons stated in this opinion, restraining the defendants, their officers, agents, servants, employees and attorneys, and all persons in active concert or participation with them who receive actual notice of this order by personal service or otherwise, from using the acronym "REP" (which this Court hereby finds to be a false representation that defendants are Republicans, being made in conjunction with the forthcoming April 7, 1981 Lyons Township election) until the issues in this action are fully heard and determined. From the evidence adduced at the hearing in this matter the Court determines that the monetary costs and damages that might be incurred or suffered by defendants if they were found to have been wrongfully enjoined or restrained would be limited to such costs and damages connected with these proceedings, and there is no showing that a bond in the sum of $5,000 should not be adequate for the payment of such costs and damages. In order that the preliminary injunction be effective immediately this Court approves the undertaking by counsel for plaintiffs, if they so desire, to become the sureties for the payment of such costs and damages in said amount, subject to being released forthwith upon the provision of security in the form of a bond by a professional surety company.

Defendant Walsh's motion to dismiss is groundless and must be denied. Its only argument not fully answered by the text of this opinion is its claimed reliance on other proceedings brought in the state courts by another plaintiff, seeking review of an Election Board determination as to claimed violations of the Illinois Election Code by defendants' party. In view of the emergency timing of this matter and the *constitutional* rather than statutory approach this Court must bring to the case, the Court declines defendant Walsh's invitation "to abstain from jurisdiction and hearing this matter until such time as the State court system acts upon the alleged grievances."