**Michael A. LEBRON, Appellant,**

v.

**WASHINGTON METROPOLITAN AREA TRANSIT AUTHORITY, et al.**

No. 84–5189.

United States Court of Appeals, District of Columbia Circuit.

Argued May 29, 1984.

Decided Dec. 14, 1984.

———

Donald Weightman, Washington, D.C., with whom Alan J. Roth, Washington, D.C., was on brief, for appellant. Nancy E.

Wiegers, Washington, D.C., also entered an appearance for appellant.

Thomas Fortune Fay, Olney, Md., with whom John C. Swanson, Washington, D.C., was on brief, for appellee.

Arthur B. Spitzer, Washington, D.C., was on brief for amicus curiae, American Civil Liberties Union of the Nat. Capital Area, urging reversal.

Before BORK, SCALIA, and STARR, Circuit Judges.

Opinion for the Court filed by Circuit Judge BORK.

BORK, Circuit Judge.

This case arose when the Washington Metropolitan Area Transit Authority ("WMATA" or "Authority") refused to lease display space in its subway stations to Michael A. Lebron, who sought to display a poster critical of the Reagan administration. WMATA refused because in its judgment Mr. Lebron's poster is "deceptive." Mr. Lebron then sued to enjoin WMATA from violating the rights guaranteed him by the first and fourteenth amendments to the Constitution and to compel the Authority to let him display his poster. He also sought damages. The district court denied Mr. Lebron relief, agreeing with WMATA that the poster is "deceptive and distorted" and therefore not protected by the first amendment. A motions panel of this Court ordered WMATA to show the poster pending this appeal. We reverse the judgment for WMATA.

## I.

WMATA was established through a congressionally approved interstate compact to improve public transportation in the Washington, D.C. metropolitan area. One way in which the Authority raises revenue is by leasing the free-standing dioramas inside subway stations for use as advertising space. WMATA accepts both public service and commercial advertisements, although there is a fee difference based upon the type of advertisement.[1] Submitted advertisements are evaluated by WMATA's Director of Marketing, John E. Warrington, based upon guidelines set by the Authority's Board of Directors. Guideline No. 2 states, in part, that "[a]ll copy and artwork should avoid conveying derisive, exaggerated, distorted, deceptive or offensive impressions." Plaintiff's Exh. 3, included in Record Excerpts ("R.E."), as Exhibit A. WMATA has in the past rented display space to groups seeking to convey messages of public interest and about candidates for local political office.[2] *Lebron v. Washington Metropolitan Area Transit Authority*, 585 F.Supp. 1461 at 1465 (D.D.C.1984) ("Mem. op.").

In October of 1983, Mr. Lebron, an artist from New York City, asked to rent diorama space to display a political poster. The poster contains text transposed over and below a photomontage. The left side of the photomontage depicts President Reagan and a number of administration officials seated at a table laden with food and drink. All the men are smiling or laughing and President Reagan is pointing to the right side of the poster. Standing on the right side, looking towards the President with expressions of hostility or sullenness, are a number of casually dressed men and women, some of whom are members of racial minorities. Were the photomontage taken to be a single photograph, the President and his men would appear to be laughing at those on the opposite side of the

---

1. Mr. Lebron has at all times offered to pay the higher, commercial rates to display his advertisement. Complaint ¶ 17.

2. The district court found that WMATA has "rented subway advertising space for political and social commentary advertisements covering a broad spectrum of political views and ideas." *Lebron v. Washington Metropolitan Area Transit Authority*, 585 F.Supp. 1461 at 1464 (D.D.C. Mar.

21, 1984). For example, WMATA has accepted for display advertisements for the pro-nuclear power positions of the Edison Electric Institute, for an anti-abortion group called Birthright of Northern Virginia, for the Rape Crisis Center, and for many religious groups, including the Unification Church and the Founding Church of Scientology. *Gay Activists Alliance v. WMATA*, 5 Media L.Rep. (BNA) 1404, 1405 (D.D.C.1979).

poster. At the top of the poster, emblazoned in yellow (in contrast to the black and white of the photomontage), is the caption "Tired of the JELLYBEAN RE-PUBLIC?" The bottom of the poster presents text critical of the Reagan administration's policies. The poster is plainly political and was "intended to convey Mr. Lebron's belief about the manner in which certain segments of the American population have reacted to the effects of the Reagan administration's policies on them." Mem. op. at 1463. Mr. Lebron offered to place on the poster the following disclaimer:

> The photographic montage appearing here is a composite, and does not represent an actual encounter between or among the persons depicted. The views expressed are solely those of the author and artist, Michael Lebron, and are not to be attributed to any of the persons depicted hereon, Metro, its employees, TDI, or its employees.

Complaint ¶ 24. He proposed to place this disclaimer in small print in the lower right hand corner of the photomontage.

The preproduction version of the poster Mr. Lebron sent to WMATA's subcontractor for marketing, TDI-Winston Network, Inc.,[3] was forwarded to Mr. Warrington, who rejected the poster on the ground that it did not satisfy WMATA's guidelines. R.E. at Exh. A. Mr. Lebron's counsel requested reconsideration and, after consultation with WMATA's counsel, Mr. Warrington reversed his earlier decision and approved the advertisement.[4]

Concerned about his change of position, Mr. Warrington told WMATA's General Manager about the poster. The General Manager convened a meeting of selected WMATA personnel to discuss the issue, and this group unanimously found the picture deceptive. After this meeting Mr. Warrington informed Mr. Lebron's counsel that "a broader representative group" had determined that the poster "so clearly violate[s] the guidelines ... that the request must be turned down." Letter from John E. Warrington to Donald Weightman (Jan. 3, 1984); R.E. at Exh. E. This decision, according to the trial court, was not based upon the poster's political message but on the group's judgment that the photomontage was distorted and deceptive. Mem. op. at 1464, 1465.

Mr. Lebron sought preliminary relief on the grounds that WMATA's actions violated 42 U.S.C. § 1983 (1982) and the first amendment. The district court denied a temporary restraining order on the following day, finding no irreparable injury. The parties agreed to consolidate the motion for a preliminary injunction with trial on the merits. Mem. op. at 1462.

After trial the court held that Mr. Lebron's constitutional rights had not been violated and that the regulation was valid. Specifically, the court found that WMATA had not evaluated the content of the photomontage and rejected it because of its political message. Rather, "WMATA permissibly concluded that the photomontage is deceptive and distorted since it depicts an apparent event which actually did not occur." Mem. op. at 1464 (footnote omitted).[5]

---

**3.** TDI-Winston Network Inc. was originally a named defendant in this action. The suit against it was dropped after it filed a stipulation with the district court agreeing to comply with the court's decision. Stipulation of Dismissal (Jan. 25, 1984).

**4.** WMATA conceded to the district court that Mr. Lebron relied to his detriment on WMATA's acceptance of the poster and incurred certain expenses in producing the poster. Based upon that reliance, WMATA has agreed that Mr. Lebron is entitled to reimbursement. Mem. op. at 1468.

**5.** The lower court found that the proffered disclaimer would not

> effectively prevent passersby from being deceived into believing that the portrayed derisive confrontation actually did occur. The disclaimer could be read only if a subway passenger took the time to stop and study the entire advertisement at close range. The print size and placement of the disclaimer would not provide adequate notice that the event supposedly being depicted in fact had not occurred.

Mem. op. at 1464 (citations and footnotes omitted).

**896**

The district court also upheld the guideline that prohibited deceptive advertising as a reasonable time, place and manner regulation. Mem. op. at 1467. The court found that WMATA's interest in preventing purposeful deception and its proprietary interest in raising revenue from its advertising space justified the imposition of the restraint.

## II.

■ There is no doubt that the poster at issue here conveys a political message; nor is there a question that WMATA has converted its subway stations into public fora by accepting other political advertising. Mem. op. at 1465; *see Gay Activists Alliance v. WMATA*, 5 Media L.Rep. (BNA) 1404, 1406–09 (D.D.C.1979). *See also Perry Education Ass'n v. Perry Local Educator's Ass'n*, 460 U.S. 37, 45, 103 S.Ct. 948, 954, 74 L.Ed.2d 794 (1983).[6] Because WMATA, a government agency, tried to prevent Mr. Lebron from exhibiting his poster "in advance of actual expression," *Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 553, 95 S.Ct. 1239, 1243, 43 L.Ed.2d 448 (1975), WMATA's action can be characterized as a "prior restraint," *id.*, which comes before us bearing a presumption of unconstitutionality. *E.g., Bantam Books, Inc. v. Sullivan*, 372 U.S. 58, 70, 83 S.Ct. 631, 639, 9 L.Ed.2d 584 (1963) (citing cases). Subject to a limited number of exceptions—most notably, reasonable time, place and manner regulations—political speech may not constitutionally be restricted in a public forum. This case does not come within those exceptions and accordingly we reverse the district court and hold that WMATA violated the plaintiff's first amendment right of free speech.

### A.

WMATA's refusal to accept this poster for display because of its content is a clear-cut prior restraint. Here, WMATA has by official action prevented Mr. Lebron from using a public forum to say what he wants to say. *Southeastern Promotions*, 420 U.S. at 553, 95 S.Ct. at 1243. As such, WMATA "carries a heavy burden of showing justification for the imposition of such a restraint." *Organization for a Better Austin v. Keefe*, 402 U.S. 415, 419, 91 S.Ct. 1575, 1577, 29 L.Ed.2d 1 (1971). *See New York Times Co. v. United States*, 403 U.S. 713, 714, 91 S.Ct. 2140, 2141, 29 L.Ed.2d 822 (1971) (per curiam). We impose this burden on public officials because of "[o]ur distaste for censorship—reflecting the natural distaste of a free people—[which] is deep-written in our law." *Southeastern Promotions*, 420 U.S. at 553, 95 S.Ct. at 1243. As Chief Justice Burger has recently reminded us, however, "to say the [guideline] presents a First Amendment *issue* is not necessarily to say that it constitutes a First Amendment *violation.*" *Metromedia, Inc. v. San Diego*, 453 U.S. 490, 561, 101 S.Ct. 2882, 2920, 69 L.Ed.2d 800 (1981) (Burger, C.J., dissenting). All prior restraints are not *per se* unconstitutional, *Southeastern Promotions*, 420 U.S. at 558, 95 S.Ct. at 1246, for "[i]t has been clear since [the Supreme] Court's earliest decisions concerning the freedom of speech that the state may sometimes curtail speech when necessary to advance a significant and legitimate state interest." *Members of the City Council of Los Angeles v. Taxpayers for Vincent*, —— U.S. ——, 104 S.Ct. 2118, 2128, 80 L.Ed.2d 772 (1984) (citation omitted).

The asserted governmental interests served by Guideline No. 2 are "WMATA's responsibility to the public in preventing purposeful deceptions" and its "proprietary

---

**6.** Unlike *Lehman v. City of Shaker Heights*, 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974), where the Supreme Court sustained a ban on all political advertising inside a city transit system, the Authority here, by accepting political advertising, has made its subway stations into public fora. *Perry Education Ass'n v. Perry Local Edu-*

*cator's Ass'n*, 460 U.S. at 45, 103 S.Ct. at 954 (once "the state has opened [public property] for use by the public as a place for expressive activity," certain exclusions are constitutionally forbidden, even if the state "was not required to create the forum in the first place").

interest in raising revenue from its advertising space." Mem. op. at 1467. The second is subsumed by the first: WMATA's fear is of a " 'considerable loss of advertisement revenue from those advertisers who will not become associated with untruthful, distorted or deceptive displays.' " *Id., quoting* Defendant's Opposition to Plaintiff's Motion for a Preliminary Injunction at 10. We find that the asserted interest in preventing deception is not served here because, simply put, this poster is not deceptive.

■ In making this determination, we are guided by the Supreme Court's recent decision in *Bose Corp. v. Consumers Union of United States, Inc.,* — U.S. —, 104 S.Ct. 1949, 1958, 80 L.Ed.2d 502 (1984). In *Bose,* the Court set out the responsibility of an appellate court in cases raising first amendment issues: "an appellate court has an obligation to make an independent examination of the whole record in order to make sure that the judgment does not constitute a forbidden intrusion on the field of free expression." *Id.* (citations and quotation marks omitted). *See National Association of Letter Carriers v. Austin,* 418 U.S. 264, 282, 94 S.Ct. 2770, 2780, 41 L.Ed.2d 745 (1974); *Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 11, 90 S.Ct. 1537, 1540, 26 L.Ed.2d 6 (1970). This injunction is particularly easy for us to obey in this case for we have the poster in hand, and there are no questions of

credibility.[7] The issue is one of judgment only—namely, would a reasonable man believe that this poster depicts an event that actually took place.[8] Carefully inspecting the poster for ourselves, we are "left with the definite and firm conviction that a mistake has been committed" by the district court. *United States v. Gypsum,* 333 U.S. 364, 395, 68 S.Ct. 525, 541, 92 L.Ed.2d 746 (1948).[9] The poster's text, the utter implausibility of the scene portrayed, the difference in lighting between the two halves of the photomontage, the awkward relation of the two groups of figures to one another, the difference in the sizes of the figures in the two groups, and the proffered disclaimer make inevitable this conclusion. No reasonable person could think this a photograph of an actual meeting. In looking at this poster, moreover, the observer's eye is immediately drawn to the bold-faced, bright yellow text reading, "Tired of the JELLYBEAN REPUBLIC?" The message is that of an advocate; it sets the poster's tone and alerts the reader that the message disparages the Reagan administration. There is no pretext of objectivity. Given the context, the reasonable reader will subject the poster's entire content, including the photomontage, to a level and kind of scrutiny different from the scrutiny generally given to messages pretending to be dispassionately informative. *Cf. Greenbelt Cooperative Publishing Ass'n v. Bresler,* 398 U.S. 6, 14, 90 S.Ct. 1537, 1541, 26

---

**7.** We do not defer to the agency in cases such as these. "When the executive or the administrative process abridges constitutional rights, it is subject to closer scrutiny than otherwise, and ultimately it is the court rather than the agency that must balance the competing interests." *A Quaker Action Group v. Morton,* 516 F.2d 717, 723 (D.C.Cir.1975).

**8.** That some small number of careless readers might be misled by this poster changes neither our inquiry nor our conclusion. Speakers are not required to indulge the lowest common denominator of the populace; first amendment protection is not limited only to messages which every reader, no matter how ill-informed or inattentive, can comprehend. *Cf. Butler v. Michigan,* 352 U.S. 380, 383, 77 S.Ct. 524, 525, 1 L.Ed.2d 412 (1957) (striking down a statute "quarantining the general reading public against

books not too rugged for grown men and women in order to shield juvenile innocence" because its effect was "to reduce the adult population ... to reading only what is fit for children").

**9.** In *Bose,* the Supreme Court discussed those types of facts appellate courts may review in the course of their independent review of the record. 104 S.Ct. at 1959–60 nn. 16–17. The finding of fact at issue here is the kind that is "inseparable from the principles from which it was deduced." *Id.* at 1960 n. 17. The "stakes ... are too great" in cases implicating the freedom of speech to entrust determinations of falsity in advance of actual expression "finally to the judgment of the trier of fact," and thus to preclude reviewing courts from exercising their own independent judgment. *Id.*

L.Ed.2d 6 (1970). Finally, the proffered disclaimer, while perhaps not quite large enough to be immediately noticeable or effective on its own, when combined with the other factors reveals to the observer that the photomontage does not depict an actual event. It is apparent at once that the poster does not purport to show an actual scene but to make a metaphorical political statement.

■ In fact, the district judge stated that "the photomontage is sufficiently ambiguous to allow a discerning viewer to recognize it as a composite." Mem. op. at 1464 n. 4. Although we think the photomontage recognizable as a composite by persons considerably less acute than a "discerning viewer," the ambiguity specified by the district court is enough to support a finding that WMATA acted unconstitutionally. To assess speech in a public forum some balancing may be necessary, but "the thumb of the [c]ourt [should] be on the speech side of the scales." Kalven, *The Concept of the Public Forum: Cox v. Louisiana*, 1965 Sup.Ct.Rev. 1, 28. *See Cox v. Louisiana*, 379 U.S. 536, 578, 85 S.Ct. 453, 468, 13 L.Ed.2d 471 (1965) ("[T]his Court does, and I agree that it should, 'weigh the circumstances' in order to protect, not to destroy, freedom of speech, press and religion.") (Black, J.). In light of the "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open," *New York Times v. Sullivan*, 376 U.S. 254, 270, 84 S.Ct. 710, 720, 11 L.Ed.2d 686 (1964), courts ought not to restrain speech where the message sought to be communicated is political and is "sufficiently ambiguous to allow a discerning viewer" (or reader) to recognize it as something other than a reproduction of an actual event.

## B.

Judge Scalia is of the view that, while it is a sound judicial practice to avoid passing upon constitutional issues, it is also a sound judicial practice, of even more venerable antiquity, to avoid passing upon the truth or falsity of political pamphleteering or advertising, particularly in the context of prior restraint. He would give the latter policy preference here, and would decline to judge whether Mr. Lebron seeks to publish a political message that is false. He would reverse the district court because a scheme that empowers agencies of a political branch of government to impose prior restraint upon a political message because of its falsity is unconstitutional.

Although Judge Starr would not reach the issue, I agree with this basis of reversal as well. I know of no case that supports an attempt at censorship equivalent to that which has occurred here. Prior administrative restraint of political messages on a content-related basis other than substantive falsity—notably, obscenity—is permissible.[10] *Cf. Freedman v. Maryland*, 380 U.S. 51, 58–59, 85 S.Ct. 734, 738–39, 13 L.Ed.2d 649 (1965) (outlining elements that would validate film censorship scheme). And in extreme situations prior *judicial* restraint on the basis of falsity may be appropriate. *See, e.g., Tomei v. Finley*, 512 F.Supp. 695 (N.D.Ill.1981) (granting preliminary injunction prohibiting use in political advertising of the acronym "REP" [Representation for Every Person party] on grounds that it falsely implied affiliation with Republican party). But prior administrative restraint of distinctively political messages on the basis of their alleged deceptiveness is unheard-of—and deservedly

10. Even then, however—and even when distinctively political speech is *not* involved—the Supreme Court has said that the administrative restraint can only be temporary, for a specified period pending the administrative agency's seeking of a judicial restraint. *Southeastern Promotions*, 420 U.S. at 560, 95 S.Ct. at 1247. Such a requirement seems inconvenient if not unworkable in the context of managing the advertising business of a state-run commercial enterprise such as a bus or subway. As does the principle generally applicable elsewhere that political speech cannot be required to conform to even rudimentary canons of good taste. *Cohen v. California*, 403 U.S. 15, 91 S.Ct. 1780, 29 L.Ed.2d 284 (1971). These are valid reasons to doubt whether such enterprises should be considered mandatory public forums that cannot generically reject political speech.

so. In *Vanasco v. Schwartz,* 401 F.Supp. 87 (S.D.N.Y.1975), a three-judge court struck down as unconstitutional on its face New York's "Fair Campaign Code," which prohibited, *inter alia,* "misrepresentation" of any candidate's qualifications or positions, in part because of lack of judicial involvement in the determination. The Supreme Court summarily affirmed without opinion. 423 U.S. 1041, 96 S.Ct. 763, 46 L.Ed.2d 630 (1976).

█ WMATA argues, and the district court agreed, that it is not engaged in unlawful censorship but is administering a permissible and reasonable time, place and manner regulation. But, since WMATA is judging the truth of a political statement, to accept its argument is to destroy the distinction between content-neutral and content-based regulations. Even if WMATA "do[es] not differentiate among political viewpoints in political and social advertisements," mem. op. at 1467, an assessment of the deceptiveness of a message necessarily involves a judgment about the substance and content of that message. Although Guideline No. 2 does not, on its face, favor one viewpoint or idea at the expense of another, *see DeJonge v. Oregon,* 299 U.S. 353, 356, 57 S.Ct. 255, 256, 81 L.Ed. 278 (1937) (state statute prohibited advocacy of doctrine of "criminal syndicalism"), and does not discriminate on the basis of the subject matter of the speech, *see First National Bank of Boston v. Bellotti,* 435 U.S. 765, 767, 98 S.Ct. 1407, 1411, 55 L.Ed.2d 707 (1978) (state statute barred banks from spending money to influence voting on referendum proposals), it is sim-

ply not content-neutral. Applying this guideline involves an exercise of discretion and subjective judgment on the part of WMATA officials. It is not a time, place and manner restriction. Even if applied pursuant to procedural safeguards, the guideline would be unconstitutionally overbroad as applied to political speech.

I note that this conclusion does not necessarily place WMATA in the position of having to accept and display before its riders deceptive political advertising. If that prospect is repugnant it can possibly be avoided by declining to accept political advertising in general.[11] The availability of that recourse, at least as far as this court is concerned, depends upon whether subway stations are more akin to airports, *see Southwest Africa/Namibia Trade & Cultural Council v. United States,* 708 F.2d 760 (D.C.Cir.1983), or to public buses, *see Lehman v. City of Shaker Heights,* 418 U.S. 298, 94 S.Ct. 2714, 41 L.Ed.2d 770 (1974). *See also Members of the City Council of Los Angeles v. Taxpayers for Vincent,* —— U.S. ——, 104 S.Ct. 2118, 2134 n. 32, 80 L.Ed.2d 772 (1984). We need not reach that issue here.

For the reasons set forth above, the judgment of the district court is

*Reversed.*

---

11. WMATA is apparently concerned that its inability to control the messages displayed in its subway stations would leave it open to defamation actions based upon those messages. Although we need not decide this question to resolve the present case, we note that to the extent that WMATA is duty-bound to carry these messages, exposure to defamation liability is unlikely. In *Farmers Educational & Cooperative Union of America v. WDAY,* 360 U.S. 525, 533–35, 79 S.Ct. 1302, 1307–08, 3 L.Ed.2d 1407 (1959), the Supreme Court held that a radio station was immune from a defamation action where it was forbidden to censor libelous mate-

rial it was under a statutory obligation to broadcast. That the station could avoid that obligation by refusing to sell time to any candidates did not vitiate the station's immunity. Similarly, here WMATA made an initial decision to accept political advertising. We express no opinion as to whether WMATA was obliged to make that decision—but, having made it, WMATA's power to reject political advertisements is subject to the strict protections the first amendment extends to political speech in a public forum. Where WMATA has no power to reject a particular advertisement, defamation liability should not follow.