UNITED WE STAND AMERICA, INC.,
a D.C. Corporation, Plaintiff–
Counterdefendant–Appellee,

v.

UNITED WE STAND, AMERICA NEW YORK, INC., a New York Corporation, Defendant–Appellant,

and

Alex Rodriguez, individually and d/b/a United We Stand, America New York, Inc., Defendant–Counterclaimant–Appellant.

No. 1681, Docket 96–9500.

United States Court of Appeals, Second Circuit.

Argued June 3, 1997.

Decided Oct. 15, 1997.

Thomas J. Hillgardner, Flushing, NY (Hillgardner & Hansen, Flushing, NY), for Defendants–Counterclaimant–Appellants.

Loretta M. Gastwirth, Mineola, NY (Meltzer, Lippe, Goldstein, Wolf & Schlissel, P.C., Mineola, NY, Kim J. Askew, Craig W. Budner, David J. Schenck, Hughes & Luce, L.L.P., Dallas, TX), for Plaintiff–Counterdefendant–Appellee.

Before: MESKILL, JACOBS and LEVAL, Circuit Judges.

LEVAL, Circuit Judge:

United We Stand America, Inc. ("United") brought this action to enjoin the use of its registered service mark "United We Stand America" by defendants United We Stand, America New York, Inc. ("UWSANY") and Alex Rodriguez. The district court entered default judgment against UWSANY after its failure to appear, and granted summary judgment in favor of plaintiff United against Rodriguez. UWSANY's motion to vacate the default was denied.

Both defendants appeal. UWSANY argues that its default should have been vacated under Fed.R.Civ.P. 60(b) because it was due to "excusable neglect." Both defendants contend that (i) their political activities are not "services" within the meaning of the Lanham Act, 15 U.S.C. § 1114(1)(a), so that their use of plaintiff's mark in connection with their activities does not violate the Act; (ii) their use of the mark is entirely intrastate and is therefore not within the reach of the Commerce Clause or the Lanham Act; and (iii) their use of plaintiff's mark in their political activities is protected by the First Amendment. We reject these arguments and affirm the judgment of the district court.

*Background*

"United We Stand America" (the "Mark") was a service mark initially used by the principal campaign committee for Ross Perot's 1992 presidential campaign. The Perot committee actively used the Mark in New York and on a national basis from August 1992 onward. Perot's campaign committee established the plaintiff corporation United and, shortly after the 1992 election, assigned its rights in the Mark to the plaintiff. United immediately filed with the Patent and Trademark Office for registration, which became effective in 1994.

Defendant Rodriguez worked with the Perot campaign in New York in 1992 and was aware of its use of the Mark as its slogan. After friction and division among Perot's New York supporters, Rodriguez incorporated UWSANY in October 1992, and became its president. Rodriguez caused UWSANY to use the Mark in connection with its political activities.

In June 1994, United filed a complaint against UWSANY and Rodriguez charging infringement of its Mark. The amended complaint alleges claims of infringement and unfair competition under the Lanham Act, 15 U.S.C. § 1051 *et seq.*, common law infringement and unfair competition under New York law, and violations of N.Y. Business Law §§ 133 and 368–d.

Although UWSANY appeared through counsel on July 1, 1994, its attorney was not retained to represent UWSANY in this matter and immediately withdrew. UWSANY was ordered to retain counsel by August 15, 1994, or face default judgment. On August 15, UWSANY appeared through counsel. However, the attorney moved to withdraw two days later. The district court allowed his withdrawal when the attorney explained that he had a physical disability which made it impossible for him to represent UWSANY, that he had told this to UWSANY before appearing, and that UWSANY had assured him it would immediately hire substitute counsel. On June 7, 1995, the district court entered a default judgment against UWSANY because it had "failed to retain counsel after repeated orders by the Court to do so" and, as a result, had failed to enter a timely answer to the complaint.

UWSANY subsequently retained counsel and, in October 1995, sought to vacate the default judgment. The motion was referred to Magistrate Judge Dolinger, who recommended that the motion be denied. The magistrate judge found that UWSANY failed to show "excusable neglect," Fed.R.Civ.P. 60(b), and, further, that it had not proceeded in good faith. In addition, he ruled that UWSANY had failed to show a meritorious defense and that United would be unfairly prejudiced by a decision to vacate the default. The district court adopted the magistrate judge's findings and recommendations, and denied UWSANY's motion to vacate the default judgment.

In the interim Rodriguez filed a counterclaim charging United with obtaining its service mark registration by fraud. United moved for summary judgment against Rodriguez. In a report dated April 29, 1996,

Magistrate Judge Dolinger recommended that summary judgment be granted in favor of United both on its own claims and on Rodriguez's counterclaim. Rodriguez's counterclaim was to be dismissed because Rodriguez failed to show that United made misrepresentations in registering the Mark. Summary judgment was to be granted in favor of United on its claims against Rodriguez because he raised no valid defense. The district court adopted Magistrate Judge Dolinger's recommendation in full and granted summary judgment in United's favor.

### Discussion

 UWSANY challenges the denial of its motion to vacate default judgment against it. Under Fed.R.Civ.P. 60(b), default judgment may be vacated upon a showing of "excusable neglect." In evaluating "excusable neglect," courts generally consider "(1) whether the default was willful; (2) whether defendant has a meritorious defense; and (3) the level of prejudice that may occur to the non-defaulting party if relief is granted." *American Alliance Ins. Co., Ltd. v. Eagle Ins. Co.*, 92 F.3d 57, 59 (2d Cir.1996). The district court denied UWSANY's motion to vacate based on its findings, *inter alia*, that default was willful and that UWSANY had failed to show a meritorious defense to the charges against it. We review this decision for abuse of discretion. *Commercial Bank of Kuwait v. Rafidain Bank*, 15 F.3d 238, 243 (2d Cir.1994).

 UWSANY argues that its default was not willful because it resulted solely from its financial inability to retain counsel. There was, however, substantial evidence supporting the magistrate judge's conclusion, adopted by the district court, that UWSANY's efforts to obtain counsel were a disguise for stalling tactics and that it lacked candor in reporting these efforts to the district judge. Despite its representations that it was attempting to retain an attorney, UWSANY took no steps to do so until the court issued an order threatening default. It then procured the appearance of an attorney who it knew was physically unable to carry out the representation and intended to withdraw immediately; the district court charac-

terized UWSANY's conduct as "a sham effort ... to avoid the previously imposed deadline to obtain counsel." During the fifteen-month period in which UWSANY purportedly attempted to retain counsel, it contacted only a handful of attorneys. The magistrate judge concluded that the apparent effort to retain counsel was in fact dissimulation, and the district court agreed. We find no error in this conclusion.

Moreover, we agree with the district court, for reasons discussed below, that UWSANY and Rodriguez have not demonstrated a meritorious defense to the charges against them.

1. *UWSANY's political activities are "services" within the meaning of the Lanham Act.*

 Appellants contend that UWSANY's political activities, in connection with which it used the Mark, were not "services" within the meaning of the Lanham Act, and that their conduct was, therefore, not within the Act's prohibition. Section 1114(1)(a) bars unauthorized use of a mark

> in commerce ... in connection with the sale, offering for sale, distribution, or advertising of any goods or *services* [if] ... such use is likely to cause confusion....

15 U.S.C. § 1114(1)(a) (emphasis added).

The term "services" has been interpreted broadly. As the court explained in *N.A.A.C.P. v. N.A.A.C.P. Legal Defense and Educ. Fund*, the right to enjoin infringement of a trade or service mark "is as available to public service organizations as to merchants and manufacturers." 559 F.Supp. 1337, 1342 (D.D.C.1983) (citation omitted), *rev'd on other grounds*, 753 F.2d 131 (D.C.Cir.), *cert. denied*, 472 U.S. 1021, 105 S.Ct. 3489, 87 L.Ed.2d 623 (1985). In support of this view, McCarthy comments that "retention of a distinct identity [by a non-profit organization that sells no goods] is just as important as it is to a commercial company." 1 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 9:5 (4th ed.1996). The protection of the trademark or service mark of non-profit and public service organizations requires that use of the mark by competing organizations be prohibited.

The Lanham Act has thus been applied to defendants furnishing a wide variety of non-commercial public and civic benefits. *See, e.g., Kappa Sigma Fraternity v. Kappa Sigma Gamma Fraternity,* 654 F.Supp. 1095, 1101 (D.N.H.1987) (membership in collegiate Greek-letter fraternity and solicitation of alumni contributions); *American Diabetes Ass'n, Inc. v. Nat'l Diabetes Ass'n,* 533 F.Supp. 16, 20 (E.D.Pa.1981) (solicitation of donations), *aff'd,* 681 F.2d 804 (3d Cir.1982); *United States Jaycees v. Philadelphia Jaycees,* 490 F.Supp. 688, 691 (E.D.Pa.1980) (public service projects including Special Olympics, Christmas shopping for orphans, and half-way houses), *rev'd on other grounds,* 639 F.2d 134 (3d Cir.1981); *United States Jaycees v. San Francisco Junior Chamber of Commerce,* 354 F.Supp. 61, 64, 65 (N.D.Cal. 1972) (meetings, competitions, and other special events for young men interested in community affairs; community betterment programs), *aff'd,* 513 F.2d 1226 (9th Cir.1975).

Indeed, the Lanham Act has been applied to political organizations engaged in activities virtually identical to UWSANY's, over assertions of the same argument advanced here. In *Brach Van Houten Holding, Inc. v. Save Brach's Coalition for Chicago,* the court held that a group engaged in soliciting donations, preparing press releases, holding public meetings and press conferences, and organizing on behalf of its members' interests was performing "services" within the meaning of the Lanham Act. 856 F.Supp. 472, 475–76 (N.D.Ill.1994). Similarly, in *Committee for Idaho's High Desert v. Yost,* the court held that a non-profit organization engaged in dissemination of information about environmental causes via news releases, newsletters, and public advocacy was entitled to Lanham Act protection for its trade name even if it did not "place products into the stream of commerce." 881 F.Supp. 1457, 1470–71 (D.Idaho 1995), *aff'd,* 92 F.3d 814 (9th Cir.1996).

UWSANY was incorporated "to solicit, collect and otherwise raise money" in support of the presidential candidacy of Ross Perot. Since its incorporation, it has engaged in political organizing; established and equipped an office; solicited politicians to run on the UWSANY slate; issued press releases intended to support particular candidates and causes; endorsed candidates; and distributed partisan political literature. These are the services characteristically rendered by a political party to and for its members, adherents, and candidates. Although not undertaken for profit, they unquestionably render a service. We have no doubt that they satisfy § 1114(1)(a)'s requirement that the mark be used in connection with goods or services.

A political organization that adopts a platform and endorses candidates under a trade name performs the valuable service of communicating to voters that it has determined that the election of those candidates would be beneficial to the objectives of the organization. Thus voters who support those objectives can support the endorsed candidates with some confidence that doing so will advance the voters' objectives. If different organizations were permitted to employ the same trade name in endorsing candidates, voters would be unable to derive any significance from an endorsement, as they would not know whether the endorsement came from the organization whose objectives they shared or from another organization using the same name. Any group trading in political ideas would be free to distribute publicity statements, endorsements, and position papers in the name of the "Republican Party," the "Democratic Party," or any other. The resulting confusion would be catastrophic; voters would have no way of understanding the significance of an endorsement or position taken by parties of recognized major names.[1] The suggestion that the performance of such functions is not within the scope of "services in commerce" seem to us to be not only wrong but extraordinarily impractical for the functioning of our political system. *See Tomei v. Finley,* 512 F.Supp. 695, 698 (N.D.Ill.1981) (preliminary injunction issued because of strong likelihood of confusion resulting from political party's use of acronym designed to deceive voters into

---

[1]. We imply no restriction on the right of members of a political party to adopt nonconfusing, related trade names, such as "Democrats for Jones."

thinking the candidate was of the opposing political party).[2]

UWSANY relies heavily on *Lucasfilm Ltd. v. High Frontier*, 622 F.Supp. 931 (D.D.C. 1985), where the court suggested that "[p]urveying points of view is not a service" contemplated by the Lanham Act. *Id.* at 934. We disagree with this portion of the court's discussion in *Lucasfilm.* That suit was brought by the creator of the Star Wars film trilogy and owner of the Star Wars mark. Claiming harmful dilution of its mark, the plaintiff sought to prevent public interest groups from using the term Star Wars to identify the Reagan Administration's Strategic Defense Initiative. The court dismissed the complaint. Observing that relief depended on a showing that the defendants were using plaintiff's mark in connection with the sale of goods or services in commerce, the court found that defendants were "not engaged in selling anything but ideas," that their use of plaintiff's mark was part of an "attempt to persuade the public of their ... viewpoints," and that this was "not the type of use that the laws against trademark infringement and unfair competition are designed to restrict." *Id.* The court went on to observe that "[d]efendants' only activity is trying to communicate their ideas. Purveying points of view is not a service." *Id.*

Defendant also relies on *L.L. Bean, Inc. v. Drake Publishers, Inc.*, 811 F.2d 26 (1st Cir.), *cert. denied*, 483 U.S. 1013, 107 S.Ct. 3254, 97 L.Ed.2d 753 (1987), which followed the *Lucasfilm* analysis. *L.L. Bean* involved an effort by the famous catalogue seller of Maine woods outdoor gear to enjoin distribution of a magazine's parody of the L.L. Bean catalogue which, under an intentionally similar mark and trade dress, pretended to offer "Back–to–School–Sex" products by illustrations showing nude models using the products in provocative poses. Noting that the defendant's publication was intended solely as humorous parody of the plaintiff and in fact offered nothing for sale, the court found defendant used plaintiff's mark "solely for noncommercial purposes" and that its "paro-

dy constitutes an editorial or artistic, rather than a commercial, use of plaintiff's mark." 811 F.2d at 32.

As for *Lucasfilm*, we respectfully suggest that the court reached the right result but did not correctly describe the reason. If the court were right that communicating ideas and purveying points of view is not a service subject to the controls established by trademark law, then one who established a learning center would be free to call it Harvard or Yale University. We do not think the *Lucasfilm* court intended such a rule. In our view, the justification for denial of relief in that case lay in the fact that the defendants were using plaintiff's mark not in a manner that would create confusion as to source, but rather as part of a message whose meaning depended on reference to plaintiff's product. In describing the SDI as "Star Wars," the defendants intended to communicate the message that the Pentagon planners of SDI were spending the nation's money and risking its security in a fantasy-driven quest comparable to plaintiff's films. Thus the point was not so much that the defendants were broadly engaged in disseminating ideas, which would not take them outside the scope of the trademark laws, but that they were using plaintiff's mark as an integral part of the idea being expressed. And, defendants' use created no confusion as to the source or origin. Furthermore, even if plaintiff suffered some trademark dilution, defendants' right under the First Amendment to use plaintiff's mark to communicate the message might prevail over plaintiff's rights under the trademark law to avoid all dilution. *See Rogers v. Grimaldi*, 875 F.2d 994, 999 (2d Cir.1989); *Yankee Publishing Inc. v. News America Publishing, Inc.*, 809 F.Supp. 267, 275–76 (S.D.N.Y.1992).

In *L.L. Bean*, we think the court could not have meant that "editorial or artistic" and "commercial" are mutually exclusive categories, and that the use of a mark in connection with humorous publication cannot be an infringement. Most editorial, artistic, and hu-

---

**2.** *But see Tax Cap Committee v. Save Our Everglades, Inc.*, 933 F.Supp. 1077, 1080–81 (S.D.Fla. 1996) (group which solicits signatures on voting petitions does not provide "services" under

meaning of Lanham Act). We respectfully disagree with this holding of the Florida district court.

morous works are sold in commerce. The point was rather that the defendant's use of plaintiff's mark was an integral part of the humorous message. It poked fun at the plaintiff, but did not cause consumer confusion as to source or origin. The reasons that permit such unauthorized use are ultimately the same as the reasons that permit a critic to use trademarks in writing that Brand A batteries last longer than Brand B, or that X–Brand cameras function better than Y–Brand.[3]

We think these cases, therefore, do not help UWSANY. To the extent that their language may seem to support defendant's position, we reject that language. The crucial difference between this case and those is that UWSANY, unlike the defendants in *Lucasfilm* and *L.L. Bean*, is using the Mark not as a commentary on its owner, but instead as a source identifier. UWSANY's use of the Mark seeks to identify UWSANY as part of the same political organization or party as United—the party that championed the Perot candidacy. That is a use of the Mark in connection with "services," 15 U.S.C. § 1114(1)(a), and is covered by the Lanham Act.

2. *UWSANY's use of the Mark is "in commerce."*

■ UWSANY argues that this interpretation of "services" ignores the specification of § 1114(1)(a) that the use prohibited must be "in commerce." We disagree with its reading of the statute. The history and text of the Lanham Act show that "use in commerce" reflects Congress's intent to legislate to the limits of its authority under the Commerce Clause, rather than to limit the Lanham Act to profit-seeking uses of a trademark.

In 1879, the Supreme Court struck down a federal trademark law because it could not "find on the face of the law, or from its essential nature, that it is a regulation of commerce with foreign nations, or among the several States, or with the Indian tribes." Since the reach of the statute was not explicitly limited within the confines of Congressional power, the statute was found to be invalid. *The Trade–Mark Cases*, 100 U.S. 82, 96, 25 L.Ed. 550 (1879). The next trademark statute enacted in 1905, therefore, prohibited unauthorized use of a registered trademark "in commerce among the several States, or with a foreign nation, or with Indian tribes," language obviously intended to track the terms of the Commerce Clause. Law of Feb. 20, 1905, ch. 592, § 16, 33 Stat. 724, 728.

■ The Lanham Act, enacted in 1946, prohibited unauthorized "use" of a trademark "in commerce." Lanham Act, July 5, 1946, ch. 540, § 32, *reprinted in* 1946 U.S.C.C.A.N. 412, 421. The current version of 15 U.S.C. § 1127 provides, in language unchanged since 1946, that "[t]he intent of this chapter is to regulate commerce within the control of Congress...." It also asserts that "'commerce' means all commerce which may lawfully be regulated by Congress." The Senate Committee on Patents stated, in its report accompanying the Lanham Act, that "[t]here can be no doubt under the recent decisions of the Supreme Court of the constitutionality of a national act giving substantive ... rights in trade-marks in commerce over which Congress has plenary power...." S.Rep. No. 79–1333 (1946), *reprinted in* 1946 U.S.C.C.A.N. 1274, 1277. It appears that "use in commerce" denotes Congress's authority under the Commerce Clause rather

---

**3.** A similar confusion is present in *International Ass'n of Machinists and Aerospace Workers, AFL–CIO v. Winship Green Nursing Ctr.*, 914 F.Supp. 651 (D.Me.), *aff'd on other grounds*, 103 F.3d 196 (1st Cir.1996). In that case, the plaintiff union challenged the defendant employer's right to use the union's logo in antiunion literature simulating bills for union dues. The district court denied relief, following *L.L. Bean* and *Lucasfilm*. *Id.* at 654–56. While the court's reasoning concludes that vying for the workers' votes is not commerce and is therefore not subject to the Lanham Act, we doubt the court would have adhered to this position if the employer had circulated bogus documents that tried to mislead recipients into believing they came from the union. There was, however, no such risk. The documents circulated by the employer using the union's logo were the functional equivalent of a letter from the employer saying, "If you vote in this union, you will have to pay a lot of money in dues." The employer had a perfect right to disseminate that message notwithstanding use of the union's logo in doing so. In this crucial respect, that use is fundamentally different from ours.

than an intent to limit the Act's application to profitmaking activity. *See Planned Parenthood Federation of America, Inc. v. Bucci,* No. 97 Civ. 0629, 1997 WL 133313, at *4 (S.D.N.Y. March 24, 1997) ("Notwithstanding its jurisdictional 'in commerce' requirement, Section 1114 contains no commercial activity requirement.").

Nor is there merit to UWSANY's contention that, because its activity is conducted wholly within the State of New York, it cannot be considered to come within Congress's power to regulate "Commerce ... among the several states." U.S. Const., Art. I, Sec. 8, Clause 3. We rejected similar arguments in *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 670 (2d Cir. 1968), and *Dawn Donut Co. v. Hart's Food Stores, Inc.,* 267 F.2d 358, 365 (2d Cir.1959). We observed in *Dawn Donut* that Congress's power to protect a plaintiff's mark used in interstate commence necessarily implies the power to regulate a defendant's unauthorized use of the mark within a state's borders. "If a registrant's right to employ its trademark were subject within every state's borders to preemption or concurrent use by local business, the protection afforded a registrant by the Lanham Act would be virtually meaningless." 267 F.2d at 365. UWSANY does not (and cannot) contend that United does not use its mark interstate. Nor does *United States v. Lopez,* 514 U.S. 549, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995), call for any different view. *See United States v. Genao,* 79 F.3d 1333, 1337 (2d Cir.1996).

### 3. *UWSANY's use of the Mark is not protected by the First Amendment.*

 We reject UWSANY's further contention that its use of United's Mark is protected by the First Amendment. UWSANY is not using the phrase "United We Stand America" for an expressive purpose such as commentary, comedy, parody, news reporting or criticism, *see L.L. Bean,* 811 F.2d at 32; *Yankee Publishing,* 809 F.Supp. at 276, but instead as a means to associate itself with the political movement that sponsored the Ross Perot campaign. In other words, it is using the slogan as a mark, and using it to suggest the same source identification as plaintiffs. This is precisely the use that is reserved by the Lanham Act to the owner of the mark. Even assuming that UWSANY might communicate its political message more effectively by appropriating United's Mark, such appropriation would cause significant consumer confusion.[4] It is not protected by the First Amendment. *See San Francisco Arts & Athletics, Inc. v. United States Olympic Committee,* 483 U.S. 522, 541 & n. 19, 107 S.Ct. 2971, 2983 & n. 19, 97 L.Ed.2d 427 (1987). To allow UWSANY to use United's Mark would not only cause confusion, but would permit it to "'appropriat[e] to itself the harvest of those who have sown.'" *Id.* at 541, 107 S.Ct. at 2983 (quoting *International News Service v. Associated Press,* 248 U.S. 215, 239–40, 39 S.Ct. 68, 72, 63 L.Ed. 211 (1918)).

### 4. *Timeliness.*

 UWSANY's final claim is that United cannot enforce its service mark rights because it registered its service mark only after UWSANY's incorporation. This misunderstands the primary function of registration, which is to give notice. The owner's right to bar infringing use does not depend on registration prior to the infringer's use. As United was the first user of the Mark, and UWSANY was well aware of United's prior use before UWSANY used it, the date of United's registration is irrelevant to the dispute. *See Basile, S.p.A. v. Basile,* 899 F.2d 35, 37 n. 1 (D.C.Cir.1990).

\* \* \*

We conclude that UWSANY's motion to vacate the default judgment was properly denied and that summary judgment was properly granted in United's favor against Rodriguez.

### *Conclusion*

The judgment of the district court is affirmed.

---

**4.** Nothing in this opinion is intended to bar use of another's mark to communicate a message about the trademark holder in a manner which avoids the creation of consumer confusion. *See, e.g., Save Brach's,* 856 F.Supp. at 476.