**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
         *Plaintiff-Appellee,*

v.

XAVIER ALVAREZ, AKA Javier
Alvarez,
         *Defendant-Appellant.*

No. 08-50345

D.C. No.
2:07-cr-01035-
RGK-1
Central District of
California,
Los Angeles

ORDER DENYING
PETITION FOR
PANEL
REHEARING AND
REHEARING EN
BANC;
CONCURRENCES
IN THE ORDER;
DISSENTS TO
THE ORDER

Filed March 21, 2011

Before: Thomas G. Nelson, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Order;
Concurrence by Judge M. Smith;
Concurrence by Chief Judge Kozinski;
Dissent by Judge O'Scannlain;
Dissent by Judge Gould

## ORDER

Judges T.G. Nelson and M. Smith have voted to deny the petition for panel rehearing. Judge M. Smith has voted to deny the petition for rehearing en banc, and Judge T.G. Nelson has so recommended. Judge Bybee has voted to grant the petition for panel rehearing and rehearing en banc.

The full court was advised of the petition for rehearing en banc. A judge requested a vote on whether to rehear the matter en banc, and the matter failed to receive a majority of the votes of the nonrecused active judges in favor of en banc consideration. Fed. R. App. P. 35.

The petition for panel rehearing and rehearing en banc is DENIED.

---

M. SMITH, Circuit Judge, with whom KOZINSKI, Chief Judge, joins, concurring in the denial of rehearing en banc:

I concur in the court's decision not to rehear this case en banc, and write to respond to the dissents from that decision.

This case presents two issues: (1) Does the government bear the burden of proof to show that speech forbidden by the Stolen Valor Act (the Act), 18 U.S.C. § 704(b), is unprotected by the First Amendment, or does a criminal defendant charged under the Act bear the burden of proof to show that the targeted speech is protected by the First Amendment? (2) Is the speech forbidden by the Act protected by the First Amendment, or does it fall into one of the "well-defined and narrowly limited classes of speech" that is unprotected by the First Amendment, *United States v. Stevens*, 130 S. Ct. 1577, 1584 (2010) (internal quotation mark omitted)?

The Act provides:

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

18 U.S.C. § 704(b). The prescribed prison term is increased to one year if the decoration involved is the Medal of Honor, a distinguished-service cross, a Navy cross, an Air Force cross, a silver star, or a Purple Heart. *Id.* § 704(c), (d).

Xavier Alvarez won a seat on the Three Valley Water District Board of Directors in 2007. On July 23, 2007, at a joint meeting with a neighboring water district board, newly-seated Director Alvarez introduced himself, stating "I'm a retired marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. I'm still around." With the exception of "I'm still around," Alvarez's statement was a series of bizarre lies, and Alvarez was indicted and convicted for falsely claiming that he had been awarded the Medal of Honor.

Although the majority and Judges O'Scannlain, Gould, and Bybee (sometimes referred to collectively as the Dissenters) disagree regarding the correct answers to the questions noted *supra*, we agree on several key underlying issues. First, we all agree that the Act "seek[s] to regulate 'only . . . words,'" *Broadrick v. Oklahoma*, 413 U.S. 601, 612 (1973) (quoting *Gooding v. Wilson*, 405 U.S. 518, 520 (1972)), that the Act targets words about a specific subject (military honors), and that the Act is plainly a content-based regulation of speech. *See United States v. Alvarez*, 617 F.3d 1198, 1218-19 (9th Cir. 2010) (Bybee, J., dissenting). Second, because the Act

imposes a content-based restriction on speech, it is subjected to strict scrutiny, *United States v. Playboy Entm't Grp., Inc.*, 529 U.S. 803, 813 (2000), unless the speech it criminalizes falls into one of the "well-defined and narrowly limited classes of speech" that is unprotected by the First Amendment, *Stevens*, 130 S. Ct. at 1584 (internal quotation mark omitted).

There is also no meaningful dispute between the majority and the Dissenters concerning whether the Act survives strict scrutiny if it does not fall into one of the *Stevens* subcategories of speech that is unprotected by the First Amendment. For example, Judge Bybee acknowledged that "if the Stolen Valor Act were subjected to strict scrutiny, the Act would not satisfy this test." *Alvarez*, 617 F.3d at 1232 n.10 (Bybee, J., dissenting) (emphasis omitted). The majority and the Dissenters also agree that the Government neither proved, nor was required to prove, that Alvarez's statements helped him to obtain tangible or intangible benefits, was part of a legal proceeding, involved certifying the truth of an official document, or caused harm to anyone else.

We also note that the majority opinion does not impugn the reputation of any of our brave men and women in uniform. On the contrary. The strict scrutiny analysis of the majority opinion affirms that our men and women in uniform put themselves in harm's way because they are honorable and brave, and not because they seek to be awarded one or more of the medals covered by the Act.

## DISCUSSION

The first dispute between the majority and the Dissenters asks who bears the burden of proof in this case. The Dissenters, drawing almost entirely on defamation case law, suggest that we should invert the ordinary First Amendment burden in *all* cases involving false statements, even if criminal charges are involved. *Alvarez*, 617 F.3d at 1228-29, 1234 (Bybee, J.,

dissenting); O'Scannlain Dissent at 3767-69, 3771. But this approach inverts the burdens of proof and persuasion mandated by the Supreme Court by requiring criminal defendants to show that their speech covered by the Act falls into the categories of speech protected by the First Amendment, instead of requiring the government to prove that the targeted speech is not so protected. Ordinarily, "[w]hen the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions," and "the risk of nonpersuasion . . . must rest with the Government, not with the citizen." *Playboy Entm't Group*, 529 U.S. at 816, 818; *see also Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("In the context of governmental restriction of speech, it has long been established that the government cannot limit speech protected by the First Amendment without bearing the burden of showing that its restriction is justified."). This general rule applies with even more force in criminal cases such as this one, because the Constitution "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970).

In addressing the second question, the Dissenters rely heavily on isolated comments made by Supreme Court Justices in First Amendment cases without examining the context in which those statements were made, or the actual holdings in those cases. In each of these opinions, the Court has made clear that false speech is *not* subject to a blanket exemption from constitutional protection.

Tellingly, the Dissenters' discussion of Supreme Court case law begins with *Gertz v. Robert Welch, Inc.*, 418 U.S. 323 (1974), rather than *Gertz*'s predecessor, *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *Sullivan* held that libel laws are unconstitutional unless they include a scienter element. In reaching this conclusion, the Court asked whether speech "forfeits [First Amendment] protection by the falsity of some of its factual statements and by its alleged defamation of

respondent," and held, unequivocally, that it does not. *Id.* at 271. The Court explained:

> Authoritative interpretations of the First Amendment guarantees have consistently refused to recognize an exception for any test of truth. . . . The constitutional protection does not turn upon the truth, popularity, or social utility of the ideas and beliefs which are offered. As Madison said, "Some degree of abuse is inseparable from the proper use of every thing; and in no instance is this more true than in that of the press." In *Cantwell v. Connecticut*, 310 U.S. 296, 310 [(1940)], the Court declared: "In the realm of religious faith, and in that of political belief, sharp differences arise. In both fields the tenets of one man may seem the rankest error to his neighbor. To persuade others to his own point of view, the pleader, as we know, at times, resorts to exaggeration, to vilification of men who have been, or are, prominent in church or state, and even to false statement. But the people of this nation have ordained in the light of history, that, in spite of the probability of excesses and abuses, these liberties are, in the long view, essential to enlightened opinion and right conduct on the part of the citizens of a democracy."

*Id.* (citations omitted). The Court accordingly concluded that "[t]hat erroneous statement is inevitable in free debate, and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they need to survive." *Id.* at 271-72 (internal quotation marks omitted). The Court added that "[e]ven a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.' " *Id.* at 279 n.19 (quoting J.S. Mill, *On Liberty* 15 (Oxford: Blackwell, 1947)).

Rather than addressing *Sullivan*'s clear statement that "[a]uthoritative interpretations of the First Amendment guar-

antees have consistently refused to recognize an exception for any test of truth," *id.* at 271, the Dissenters rely heavily on the Court's post-*Sullivan* case law. Yet none of these cases contradicts *Sullivan*'s holding that at least *some* false statements are entitled to First Amendment protection. The Dissenters primarily rely on *Gertz* and its progeny for the proposition that "the erroneous statement of fact is not worthy of constitutional protection." 418 U.S. at 340. In *Gertz*, the Court classified false statements of fact as "belong[ing] to that category of utterances" that " 'are of such slight social value as a step to truth that any benefit that may be derived from them is clearly outweighed by the social interest in order and morality.' " *Id.* (quoting *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)). Thus, the Dissenters conclude, regulations of false factual speech may be proscribed without constitutional problem—or even any constitutional scrutiny.

Like *Sullivan*, *Gertz* (the earliest of the post-*Sullivan* cases cited by the Dissenters) was a defamation case. Judge O'Scannlain's Dissent repeatedly quotes *Gertz* for the proposition that "the erroneous statement of fact is not worthy of constitutional protection," *see* O'Scannlain Dissent at 3763, 3772, but *Gertz* also explained that such untrue statements are "nevertheless inevitable in free debate." 418 U.S. at 340. The *Gertz* Court then added: "The First Amendment requires that we protect some falsehood in order to protect speech that matters." *Id.* at 341. Thus, recognizing this need to protect "speech that matters," the Court endeavored to find a balance in defamation cases between the "legitimate state interest in compensating private individuals for wrongful injury to reputation," and the First Amendment requirement of "shield[ing] the press and broadcast media from the rigors of strict liability for defamation." *Id.* at 348. The Court accordingly held that plaintiffs must show some level of fault by the defendant, and further held that plaintiffs may only receive compensation for "actual injury" if it is "supported by competent evidence concerning the injury." *Id.* at 350.

In other words, although *Gertz* stated that false statements are not inherently worthy of First Amendment protection,[1] the Court did not hold that " 'false statements of fact' are categorically unprotected." O'Scannlain Dissent at 3774 (quoting *Gertz*, 418 U.S. at 340). Rather, *Gertz* held that defamatory statements are unprotected if they are *made with a culpable state of mind* and *cause injury* to another person. This is exactly what it had held a decade earlier in *Sullivan* and *Garrison v. Louisiana*, 379 U.S. 64 (1964), which only permitted defamation actions in which there is "an intent to inflict harm through falsehood." *Id.* at 73. If *Gertz* stood for the proposition that false statements are *per se* unprotected (as the Dissenters suggest), then the *Gertz* majority's reasoning would likely have looked much more like Justice White's dissent. *Compare Gertz*, 418 U.S. at 347 n.10 (majority opinion), *with id.* at 375-76 (White, J., dissenting).

In sum, "*Gertz*'s statement that false factual speech is unprotected, considered in isolation, omits discussion of essential constitutional qualifications on that proposition." *Alvarez*, 617 F.3d at 1203. Although the Court has stated that false statements of fact are *unworthy* of First Amendment protection, the Court has never held that false speech is *per se*, or even *presumptively*, *unprotected* by the First Amendment. Indeed, one of the current members of the Court, while working as a law professor, recognized "[t]he near absolute protection given to false but nondefamatory statements of fact outside the commercial realm." Elena Kagan, *Private Speech, Public Purpose: The Role of Governmental Motive in First Amendment Doctrine*, 63 U. Chi. L. Rev. 413, 477 (1996).

Consistent with this principle, the Court's standard list of categorically exempt speech has *never* used the phrase "false

---

[1] *But see Sullivan*, 376 U.S. at 279 n.19 ("Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about 'the clearer perception and livelier impression of truth, produced by its collision with error.' " (quoting Mill, *supra*, at 15)).

statements of fact." Instead, the Court has limited itself to using the words defamation (or libel) and fraud. Most recently, the Court wrote: "These historic and traditional categories [of unprotected speech] long familiar to the bar—including obscenity, defamation, fraud, incitement, and speech integral to criminal conduct—are well-defined and narrowly limited classes of speech, the prevention and punishment of which have never been thought to raise any Constitutional problem." *Stevens*, 130 S. Ct. at 1584 (citations and internal quotation marks omitted). Similar formulations have been used for at least six decades, and the Court has *never* included "false statements of fact" in its list.[2] As Judge O'Scannlain's Dissent appears to acknowledge, *all* of the cases and statutes he relies upon either fit within one of the categories discussed in *Stevens* (or its predecessors) or were subjected to First Amendment scrutiny.[3]

---

[2]*See, e.g.*, *R.A.V. v. City of St. Paul*, 505 U.S. 377, 383 (1992) (listing obscenity, defamation, and fighting words); *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Bd.*, 502 U.S. 105, 127 (1991) (Kennedy, J., concurring) (listing "obscenity, defamation, incitement, or situations presenting some grave and imminent danger the government has the power to prevent" (citations omitted)); *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 504 (1984) ("Libelous speech has been held to constitute one such category [of unprotected speech]; others that have been held to be outside the scope of the freedom of speech are fighting words, incitement to riot, obscenity, and child pornography." (citations omitted)); *New York v. Ferber*, 458 U.S. 747, 763 (1982) (listing fighting words, libel, and obscenity); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557, 592-93 (1980) (Rehnquist, J., dissenting) (listing fighting words, group libel, obscenity, and false and misleading commercial speech); *Sullivan*, 376 U.S. at 269 (listing "insurrection, contempt, advocacy of unlawful acts, breach of the peace, obscenity, [and] solicitation of legal business" (footnotes omitted)); *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 49 n.10 (1961) (listing "libel, slander, misrepresentation, obscenity, perjury, false advertising, solicitation of crime, complicity by encouragement, conspiracy, and the like"); *Chaplinsky*, 315 U.S. at 572 (listing "the lewd and obscene, the profane, the libelous, and the insulting or 'fighting' words").

[3]Although Judge O'Scannlain is correct that "not *all* of the cases in this area deal with defamation," O'Scannlain Dissent at 3774 n.6, he is also

To the extent the Court has articulated a test for determining whether a certain type of speech belongs on that list, the test is whether "[f]rom 1791 to the present," that speech has been "historically unprotected." *Stevens*, 130 S. Ct. at 1584-86. Usually, in cases involving such types of speech, "the evil to be restricted so overwhelmingly outweighs the expressive interests, if any, at stake, that no process of case-by-case adjudication is required." *Ferber*, 458 U.S. at 763-64; *see also Chaplinsky*, 315 U.S. at 572 (explaining that unprotected categories of speech "are of such slight social value as a step to truth that any benefit that may be derived from them

correct that *many* of them *do*. O'Scannlain Dissent at 3774. *See Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770 (1984); *Herbert v. Lando*, 441 U.S. 153 (1979); *Gertz*, 418 U.S. 323; *Sullivan*, 376 U.S. 254. Another case he cites involves fighting words, which also fit into the *Stevens* categories of First Amendment-exempt speech. *Chaplinsky*, 315 U.S. 568.

Judge O'Scannlain collects a number of federal and state laws prohibiting various forms of fraud and perjury. O'Scannlain Dissent at 3775-76; *see also* Black's Law Dictionary 1254 (9th ed. 2009) (defining "perjury" broadly as "[t]he act or an instance of a person's deliberately making material false or misleading statements while under oath"). Fraud, of course, is covered by *Stevens*'s categories, and perjury is included in a similar list in *Konigsberg*, 366 U.S. at 49 n.10.

Judge O'Scannlain also cites a series of cases discussing anticompetitive "sham" litigation. *E.g.*, *BE & K Constr. Co. v. NLRB*, 536 U.S. 516 (2002); *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731 (1983); *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 690 F.2d 1240 (9th Cir. 1982). These cases stand for the narrow and uncontroversial proposition that "there is simply no basis to hold that deliberately misrepresenting facts to an administrative [or judicial] body for anticompetitive purposes enjoys blanket first amendment protection." *Clipper Exxpress*, 690 F.3d at 1262.

Finally, Judge O'Scannlain cites a pair of cases that *refused* to recognize new exceptions to the First Amendment. *Hustler Magazine v. Falwell*, 485 U.S. 46, 56 (1988) ("[T]he sort of expression involved in this case [intentional infliction of emotional distress] does not seem to us to be governed by any exception to the general First Amendment principles stated above."); *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 770 (1976) ("[C]ommercial speech, like other varieties, is protected . . . .").

is clearly outweighed by the social interest in order and morality"). However, the Court has cautioned against reliance on a "freewheeling" "cost-benefit analysis." *Stevens*, 130 S. Ct. at 1586. The Court has also explained that *Chaplinsky* and its successors "do not set forth a test that may be applied as a general matter to permit the Government to imprison any speaker so long as his speech is deemed valueless or unnecessary, or so long as an ad hoc calculus of costs and benefits tilts in a statute's favor." *Id.* Instead, the exclusive test is whether the "categor[y] of speech . . . ha[s] been historically unprotected." *Id.*[4] Tellingly, in *Stevens*, the Court found the government's proposed "free-floating test for First Amendment coverage," to be "startling and dangerous," and went on to say that "[t]he First Amendment's guarantee of free speech does not extend only to categories of speech that survive an ad hoc balancing of relative social costs and benefits. The First Amendment itself reflects a judgment by the American people that the benefits of its restrictions on the Government outweigh the costs. Our Constitution forecloses any attempt to revise that judgment simply on the basis that some speech is not worth it." *Id.* at 1585.[5]

The Dissenters fail to identify a body of historical authorities showing broad regulation of *false statements of fact*. They contend that "[t]he fact that one of the Court's most recent

---

[4]Consistent with its historical test, the Court has collected authorities showing that all of the categories listed in *Stevens* have traditionally been regulated by Congress and the states. *See Roth v. United States*, 354 U.S. 476, 482-83, 485 (1957) (obscenity and libel); *Beauharnais v. Illinois*, 343 U.S. 250, 254-55 (1952) (libel); *Donaldson v. Read Magazine*, 333 U.S. 178, 190-91 (1948) (fraud); *Chaplinsky*, 315 U.S. at 571 n.2 (cited in *Giboney v. Empire Storage & Ice Co.*, 336 U.S. 490, 502 (1949)) (speech integral to criminal conduct); *see also United States v. Smull*, 236 U.S. 405, 408 & n.1 (1915) (cited in *United States v. Dunnigan*, 507 U.S. 87, 94-95 (1993)) (perjury).

[5]Judge Gould's proposed approach cannot be reconciled with the *Stevens* Court's unequivocal rejection of ad hoc, case-by-case balancing tests. *See* Gould Dissent at 3781-82.

statements on unprotected categories of speech did not expressly mention 'false statements of fact' sheds little, if any, light on the historical protection of such speech." O'Scannlain Dissent at 3774. True, but irrelevant. The Dissenters have not even attempted to trace their purported "false speech" exemption any further back than the 1960s.

In fact, the historical record regarding government regulation of false speech is problematic for the Dissenters.[6] Were they to identify historical support for such regulation, the clearest precedent would be the much-maligned Alien and Sedition Act of 1798. That infamous act "made it a crime, punishable by a $5,000 fine and five years in prison, 'if any person shall write, print, utter or publish . . . any false, scandalous and malicious writing or writings against the government of the United States, or either house of the Congress

---

[6]*See, e.g.*, *Hale v. Everett*, 53 N.H. 9, 208 (1868) ("The vice of lying, which consists (abstractedly taken) in a criminal violation of truth, and therefore, in any shape, is derogatory from sound morality, is not, however, taken notice of by our law unless it carries with it some public inconvenience, as spreading false news; or some social injury, as slander and malicious prosecution, for which a private recompense is given."); Fred B. Hart, *Power of Government Over Speech and Press*, 29 Yale L.J. 410, 427 (1920) (" 'The constitutional liberty of speech and of the press as we understand it, implies a right to freely utter and publish whatever the citizen may please, and to be protected against any responsibility for so doing except so far as such publications, from their blasphemy, obscenity or scandalous character may be a public offense, or as by their falsehood and malice may injuriously affect the standing, reputation or pecuniary interests of individuals.' " (quoting Thomas Cooley, *Constitutional Limitations* 604-05 (6th ed. 1890))).

To the extent that spreading false news was a crime at common law, prosecutions under such laws appear to have died out by the late seventeenth century. *See* Larry D. Eldridge, *Before Zenger: Truth and Seditious Speech in Colonial America, 1607-1700*, 39 Am J. Legal Hist. 337, 356 (1995) ("Increasingly, as the century went on, colonial officials simply investigated rumors [of violations of false news laws] and did little except publicly declare them to be false in an effort 'to quiet the minds of the people.' ").

. . . , or the President . . ., with intent to defame . . . or to bring
them . . . into contempt or disrepute; or to excite against them
. . . the hatred of the good people of the United States.' " *Sul-*
*livan*, 376 U.S. at 273-74 (quoting Sedition Act of 1798, 1
Stat. 596) (first four omissions in original). As explained in
*Sullivan*, upon its passage this act "was vigorously con-
demned as unconstitutional in an attack joined in by Jefferson
and Madison." *Id.* at 274. The Court explained that the histor-
ical record contained a great deal of criticism of the act, and
accordingly concluded that "[a]lthough the Sedition Act was
never tested in this Court, the attack upon its validity has car-
ried the day in the court of history." *Id.* at 276 (footnote omit-
ted). I suspect that the Dissenters do not intend to resurrect the
Alien and Sedition Act of 1798 as an exhibit in favor of their
historical argument.

That said, the Dissenters acknowledge that the Supreme
Court's case law does not clearly and uniformly support their
contention that false speech is *always* unprotected. But they
counter that the First Amendment protects only *some* false
speech "in order to protect speech that matters." *Gertz*, 418
U.S. at 341. But the Dissenters do not even attempt to identify
the types of speech that "matter." The Dissenters' "speech
that matters" approach simply invites courts to complete an
ever-expanding list, which would increasingly resemble the
Kafkaesque world so well portrayed in Chief Judge Kozin-
ski's concurrence in this case. *See* Kozinski Concurrence at
3758-59. It goes without saying that such an "ad hoc," "free-
wheeling," "case-by-case" approach is contrary to the
Supreme Court's teachings in *Stevens*, and might even be
among those the Court finds "startling and dangerous." *Ste-*
*vens*, 130 S. Ct. at 1585-86.

The Dissenters may be correct that Congress may someday
be able to redress the "reputational harm to the military"
caused by conduct like Alvarez's. O'Scannlain Dissent at
3778; *see generally* Gould Dissent. But "[*a*]*s presently*
*drafted*, the Act is facially invalid under the First Amend-

ment, and was unconstitutionally applied to make a criminal out of a man who was proven to be nothing more than a liar, without more." *Alvarez*, 617 F.3d at 1217 (emphasis added).

The Dissenters rely on the unsupportable doctrinal premise that false speech is categorically subject to government regulation and prohibition. For the reasons outlined *supra* and in my majority opinion, I respectfully disagree.

Chief Judge KOZINSKI, concurring in the denial of rehearing en banc:

According to our dissenting colleagues, "non-satirical and non-theatrical[ ] knowingly false statements of fact are *always* unprotected" by the First Amendment. *United States* v. *Alvarez*, 617 F.3d 1198, 1224 (9th Cir. 2010) (Bybee, J., dissenting); *see also* O'Scannlain dissent at 3764; *cf.* Gould dissent at 3780. Not "often," not "sometimes," but always. Not "if the government has an important interest" nor "if someone's harmed" nor "if it's made in public," but *always*. "Always" is a deliciously dangerous word, often eaten with a side of crow.

So what, exactly, does the dissenters' ever-truthful utopia look like? In a word: terrifying. If false factual statements are unprotected, then the government can prosecute not only the man who tells tall tales of winning the Congressional Medal of Honor, but also the JDater who falsely claims he's Jewish or the dentist who assures you it won't hurt a bit. Phrases such as "I'm working late tonight, hunny," "I got stuck in traffic" and "I didn't inhale" could all be made into crimes. Without the robust protections of the First Amendment, the white lies, exaggerations and deceptions that are an integral part of human intercourse would become targets of censorship, subject only to the rubber stamp known as "rational basis review."

What the dissenters seem to forget is that Alvarez was convicted for pure speech. And when it comes to pure speech, truth is not the sine qua non of First Amendment protection. *See Meyer* v. *Grant*, 486 U.S. 414, 419 (1988) ("The First Amendment is a value-free provision whose protection is not dependent on the truth, popularity or social utility of the ideas and beliefs which are offered." (internal quotation marks omitted)). That the government can constitutionally regulate some narrow categories of false speech—such as false advertising, defamation and fraud—doesn't mean that all such speech falls outside the First Amendment's bounds. As the Supreme Court has cautioned, "In this field every person must be his own watchman for the truth, because the forefathers did not trust any government to separate the true from the false for us." *Id.* at 419-20 (internal quotation mark omitted); *Thomas* v. *Collins*, 323 U.S. 516, 545 (1945) (Jackson, J., concurring). Yet the regime the dissenters agitate for today— one that criminalizes pure speech simply because it's false— leaves wide areas of public discourse to the mercies of the truth police.

Alvarez's conviction is especially troubling because he is being punished for speaking about himself, the kind of speech that is intimately bound up with a particularly important First Amendment purpose: human self-expression. As Justice Marshall explained:

> The First Amendment serves not only the needs of the polity but also those of the human spirit—a spirit that demands self-expression. Such expression is an integral part of the development of ideas and a sense of identity. To suppress expression is to reject the basic human desire for recognition and affront the individual's self worth and dignity.

*Procunier* v. *Martinez*, 416 U.S. 396, 427 (1974) (Marshall, J., concurring). Accordingly, the Court has recognized that "[o]ne fundamental concern of the First Amendment is to

'protec[t] the individual's interest in self-expression.' " *Citizens United* v. *FEC*, 130 S. Ct. 876, 972 (2010) (Stevens, J., concurring in part and dissenting in part) (quoting *Consol. Edison Co. of N.Y.* v. *Pub. Serv. Comm'n*, 447 U.S. 530, 534 n.2 (1980)) (second alteration in original). Speaking about oneself is precisely when people are most likely to exaggerate, obfuscate, embellish, omit key facts or tell tall tales. Self-expression that risks prison if it strays from the monotonous reporting of strictly accurate facts about oneself is no expression at all.

Saints may always tell the truth, but for mortals living means lying. We lie to protect our privacy ("No, I don't live around here"); to avoid hurt feelings ("Friday is my study night"); to make others feel better ("Gee you've gotten skinny"); to avoid recriminations ("I only lost $10 at poker"); to prevent grief ("The doc says you're getting better"); to maintain domestic tranquility ("She's just a friend"); to avoid social stigma ("I just haven't met the right woman"); for career advancement ("I'm sooo lucky to have a smart boss like you"); to avoid being lonely ("I love opera"); to eliminate a rival ("He has a boyfriend"); to achieve an objective ("But I love you *so* much"); to defeat an objective ("I'm allergic to latex"); to make an exit ("It's not you, it's me"); to delay the inevitable ("The check is in the mail"); to communicate displeasure ("There's nothing wrong"); to get someone off your back ("I'll call you about lunch"); to escape a nudnik ("My mother's on the other line"); to namedrop ("We go way back"); to set up a surprise party ("I need help moving the piano"); to buy time ("I'm on my way"); to keep up appearances ("We're not talking divorce"); to avoid taking out the trash ("My back hurts"); to duck an obligation ("I've got a headache"); to maintain a public image ("I go to church every Sunday"); to make a point ("Ich bin ein Berliner"); to save face ("I had too much to drink"); to humor ("Correct as usual, King Friday"); to avoid embarrassment ("That wasn't me"); to curry favor ("I've read all your books"); to get a clerkship ("You're the greatest living jurist"); to save a dollar ("I gave

at the office"); or to maintain innocence ("There are eight tiny reindeer on the rooftop").

And we don't just talk the talk, we walk the walk, as reflected by the popularity of plastic surgery, elevator shoes, wood veneer paneling, cubic zirconia, toupees, artificial turf and cross-dressing. Last year, Americans spent $40 billion on cosmetics—an industry devoted almost entirely to helping people deceive each other about their appearance. It doesn't matter whether we think that such lies are despicable or cause more harm than good. An important aspect of personal autonomy is the right to shape one's public and private persona by choosing when to tell the truth about oneself, when to conceal and when to deceive. Of course, lies are often disbelieved or discovered, and that too is part of the pull and tug of social intercourse. But it's critical to leave such interactions in private hands, so that we can make choices about who we are. How can you develop a reputation as a straight shooter if lying is not an option?

Even if untruthful speech were not valuable for its own sake, its protection is clearly required to give breathing room to truthful self-expression, which is unequivocally protected by the First Amendment. *See New York Times Co.* v. *Sullivan*, 376 U.S. 254, 271-72 (1964). Americans tell somewhere between two and fifty lies each day. *See* Jochen Mecke, *Cultures of Lying* 8 (2007). If all untruthful speech is unprotected, as the dissenters claim, we could all be made into criminals, depending on which lies those making the laws find offensive. And we would have to censor our speech to avoid the risk of prosecution for saying something that turns out to be false. The First Amendment does not tolerate giving the government such power.

Judge O'Scannlain tells us not to worry, because to say "[t]hat false statements of fact are always *unprotected* in themselves is not to say that such statements are always *subject to prohibition*." O'Scannlain dissent at 3779. This is dou-

ble talk. If a statement is "always unprotected" by the First Amendment then it's presumptively subject to regulation. That it may enjoy derivative protection by osmosis from "other speech that matters" is cold comfort to those who have no way of knowing in advance whether two judges of this court will recognize that relationship in any particular instance.

But it gets worse. Confronted with some of the many ways in which false speech permeates our discourse, Judge O'Scannlain comes up with new categories of exceptions to his regime—"expressions of emotion or sensation," "predictions or plans," "exaggerations" and "playful fancy." *Id.* at 3778-79. "Such statements," we are told, "are not even implicated" by the dissenters' analysis because they are not "falsifiable." *Id.* But this is patently not true. If you tell a girl you love her in the evening and then tell your roommate she's a bimbo the next morning, and the two compare notes, someone's going to call you a liar. And if you tell the Social Security Commissioner, "I have disabling back pain," and are then discovered jogging, golfing and jet-skiing, it will be no defense that you were merely expressing a "sensation" that is "non-falsifiable." Judge O'Scannlain also turns a tin ear to the complexity of human communication. "I just haven't met the right woman," could be a statement of opinion, as my colleague suggests, but more likely is a false affirmation of heterosexuality. And where, exactly, is the dividing line between an "exaggeration"—which Judge O'Scannlain seems to think always gets constitutional protection—and a lie, which never does?

The dissent dismisses these difficulties by creating a doctrine that is so complex, ad hoc and subjective that no one but the author can say with assurance what side of the line particular speech falls on. This not only runs smack up against the Supreme Court's admonition against taking an " 'ad hoc,' 'freewheeling,' 'case-by-case' approach" in the First Amendment area, Smith concurrence at 3755, but results in the

"courts themselves . . . becom[ing] inadvertent censors." *Snyder* v. *Phelps*, No. 09-751, 2011 WL 709517, at *6 (U.S. Mar. 2, 2011). And, as Judge Smith elegantly demonstrates, Judge O'Scannlain's approach compounds the danger of arbitrariness by "invert[ing] the ordinary First Amendment burden" in requiring the *speaker*—even in the case of a criminal defendant—to prove that his speech deserves protection. Smith concurrence at 3746. Free speech simply cannot survive the kind of subjective and unpredictable regime envisioned by the dissenters.

Judge O'Scannlain is right that the scenario I describe is "far removed from the one in which we actually live," O'Scannlain dissent at 3780, but only because the dissenters didn't prevail. Had they done so, we may very well have come to live in a world more like a Hollywood horror film than the country we know and adore.

Perhaps sensing the danger of the absolutist approach, Judge Gould proposes a narrower rule, one that would carve away First Amendment protections for speech concerning (1) some (2) military matters (3) where the interest of the speaker is low. Judge Gould's dissent illustrates the dangers of announcing a hypothetical rule without the need to apply it to a concrete case. As I show below, all three legs supporting Judge Gould's theory buckle as soon as weight is placed on them.

Before I get to that, however, let me point out just how wrong it would be to convene an en banc court in order to adopt a rule such as that proposed by our colleague. En bancs are generally appropriate to correct a conflict with the law of our own circuit, another circuit or the Supreme Court. The enterprise Judge Gould proposes would serve none of these purposes. Instead, he would have the en banc court adopt a rule no other court has ever adopted and the Supreme Court has never hinted at. This strikes me as an unwise use of en banc resources.

But on to the rule Judge Gould proposes. He first posits that "the power of Congress [in dealing with military matters] is necessarily strong," but Congress has strong powers in many areas, including immigration and naturalization, U.S. Const. art. I, § 8, cl. 4; foreign relations, *id.* cl. 3; copyright and patent, *id.* cl. 8; bankruptcy, *id.* cl. 4; interstate commerce, *id.* cl. 3; tax, *id.* cl. 1; Native Americans, *id.* cl. 3; and the District of Columbia, *id.* cl. 17. Judge Gould doesn't explain why congressional power vis-a-vis the military is so much more important than these other strong congressional powers, so as to merit its own First Amendment hall pass. Or, perhaps Judge Gould means to suggest that there should be a similar exception for, say, lying about being an immigrant or a bankrupt—which would make his exception far broader than he acknowledges.

Second, as Judge Gould recognizes, not all speech concerning military matters is unprotected by the First Amendment, else Congress could pretty much have banned the entire Vietnam protest movement—and no doubt would have. Lying about being a military hero is despicable and may have some impact on the government's ability to recruit genuine heroes, but it's hard to understand why it's so much worse than burning an American flag, displaying a profane word in court, rubbing salt into the fresh wounds of the families of fallen war heroes, suggesting that a revered religious leader commits incest with his mother in an outhouse or publishing military secrets in time of war. *See New York Times Co.* v. *United States*, 403 U.S. 713 (1971); *cf.* Charlie Savage, *U.S. Prosecutors Study WikiLeaks Prosecution*, N.Y. Times, Dec. 8, 2010, at A10. Exceptions to categorical rules, once created, are difficult to cabin; the logic of the new rule, like water, finds its own level, and it's hard to keep it from covering far more than anticipated. Because Judge Gould is vague about the rule he proposes, he doesn't deal with this difficulty.

Finally, Judge Gould would limit his rule to situations where the speaker and society "lack [a] substantial interest"

in the untruthful statement. But how are we to tell which statements do and which ones do not have social utility? The one guiding light of our First Amendment law is that government officials, and courts in particular, are not allowed to make judgments about the value of speech. Pornography is an odd exception, but it's the only one I'm aware of, and even there judgments are made on a case-by-case basis. I am aware of no context where the legislature is allowed to decide that entire categories of speech can be banned because they are socially useless. This strikes me as an awesome power to confer on government officials, one quite antithetical to the core values of the First Amendment. Judge Gould does not explain why a rule such as the one he proposes would not sound the death knell for the First Amendment as we know it.

\* \* \*

Political and self expression lie at the very heart of the First Amendment. If the First Amendment is to mean anything at all, it must mean that people are free to speak about themselves and their country as they see fit without the heavy hand of government to keep them on the straight and narrow. The Stolen Valor Act was enacted with the noble goal of protecting the highest honors given to the men and women of our military, but the freedoms for which they fight include the freedom of speech. The ability to speak openly about yourself, your beliefs and your country is the hallmark of a free nation. Our decision not to rehear this case en banc ensures the First Amendment will retain its vitality for another day—and, hopefully, for always.

O'SCANNLAIN, Circuit Judge, joined by GOULD, BYBEE, CALLAHAN, BEA, IKUTA, and N.R. SMITH, Circuit Judges, dissenting from the denial of rehearing en banc:

In this case, our court invalidates the Stolen Valor Act of 2005—a federal statute that criminalizes the act of lying about

having been awarded U.S. military decorations—concluding that the Act runs afoul of the First Amendment. This is the first Court of Appeals decision to consider the constitutionality of the Act, but the court's opinion is not merely unprecedented; rather, it runs *counter* to nearly forty years of Supreme Court precedent. Over such time, the Supreme Court has steadfastly instructed that false statements of fact are not protected by the First Amendment. Because neither the court's application of strict scrutiny nor its ultimate decision accords with Supreme Court guidance, I respectfully dissent from our court's regrettable denial of rehearing en banc.

## I

Shortly after winning election to a regional water district's board of directors, Xavier Alvarez stood in a public meeting and was asked to introduce himself. Before the assembled crowd, Alvarez proudly declared, "I'm a retired Marine of 25 years. I retired in the year 2001. Back in 1987, I was awarded the Congressional Medal of Honor. I got wounded many times by the same guy. I'm still around." *United States v. Alvarez*, 617 F.3d 1198, 1200 (9th Cir. 2010) (internal quotation marks omitted).

But Alvarez has never served in the Marines or in any other branch of the armed forces. He certainly has not been awarded the Medal of Honor, the nation's most prestigious military decoration. "In short, with the exception of 'I'm still around,' his self-introduction was nothing but a series of bizarre lies." *Id.* at 1201.

The FBI obtained a recording of the board meeting and Alvarez was indicted on two counts of falsely claiming to have received the Medal of Honor, in violation of the Stolen Valor Act, 18 U.S.C. §§ 704(b), (c)(1).[1] Alvarez moved to

---

[1]The Act provides:

dismiss the indictment, claiming that the Act is unconstitutional, and the district court denied the motion. *Alvarez*, 617 F.3d at 1201. He then pleaded guilty to one count of "falsely represent[ing] verbally that he had been awarded the Congressional Medal of Honor when, in truth and as [he] knew, he had not received the Congressional Medal of Honor," and reserved his right to appeal the First Amendment issue. *Id.* (internal quotation marks omitted) (alterations in original).

On appeal to this court, Alvarez claimed that the Act unconstitutionally restricts the freedom of speech. The court subjected the Act to strict scrutiny review, ultimately concluding that it failed to survive. The court then rendered the first and only Court of Appeals opinion to declare the Act unconstitutional—both as applied to Alvarez and on its face. Judge Bybee dissented.

## II

In giving strict scrutiny to the Stolen Valor Act, the majority ignored a straightforward aspect of First Amendment law: the right to lie is not a fundamental right under the Constitution. For nearly forty years, the Supreme Court has made this much abundantly clear. In cases concerning regulations of false speech, the Court regularly instructs that "the erroneous statement of fact is not worthy of constitutional protection."

---

> Whoever falsely represents himself or herself, verbally or in writing, to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States, any of the service medals or badges awarded to the members of such forces, the ribbon, button, or rosette of any such badge, decoration, or medal, or any colorable imitation of such item shall be fined under this title, imprisoned not more than six months, or both.

18 U.S.C. § 704(b). The penalty is enhanced if the lie involved certain enumerated medals, including the Congressional Medal of Honor. *Id.* §§ 704(c)-(d).

*Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 340 (1974). False statements are "particularly valueless," *Hustler Magazine v. Falwell*, 485 U.S. 46, 52 (1988); are "not immunized by the First Amendment right to freedom of speech," *Bill Johnson's Rests., Inc. v. NLRB*, 461 U.S. 731, 743 (1983); "ha[ve] never been protected for [their] own sake," *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 771 (1976); and "in and of [themselves] carr[y] no First Amendment credentials," *Herbert v. Lando*, 441 U.S. 153, 171 (1979).[2]

Under plain application of the Supreme Court's guidance, the Stolen Valor Act—which criminalizes only false statements of fact—should not undergo the rigor of strict scrutiny review. We reserve such intense scrutiny only for *constitutionally protected* speech. *See Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777 (1986) ("[T]he government cannot limit *speech protected by the First Amendment* without bearing the burden of showing that its restriction is justified." (emphasis added)). Yet, upon the novel theory that "we presumptively protect *all* speech, including false statements," the majority erroneously subjects the Act to strict scrutiny, and in the process holds unconstitutional a plainly valid act of Congress. *Alvarez*, 617 F.3d at 1217.

A

The notion that restrictions upon false speech do not receive strict scrutiny is borne out in the Supreme Court's analysis in cases involving such speech. The Court routinely begins its review from the foundational premise that false speech "is not worthy of constitutional protection." *Gertz*, 418

---

[2]The Court's instruction that false speech is not constitutionally protected is but a part of the more fundamental precept of First Amendment law that certain categories of speech are fully outside of that Amendment's protections. *See Chaplinsky v. New Hampshire*, 315 U.S. 568, 571-72 & n.3 (1942).

U.S. at 340. From there, the Court assesses whether *other* speech—i.e., constitutionally protected non-false speech—demands that the particular false statements in question be protected, too. Only then must restrictions on false speech pass heightened scrutiny.

1

Closer inspection of these cases buttresses the Court's straightforward words. In *Gertz v. Robert Welch, Inc.*, for example, the Supreme Court began from the premise that "there is no constitutional value in false statements of fact." 418 U.S. at 340. The Court went on to consider whether *other* First Amendment concerns required extending a heightened "actual malice" standard to defamation actions brought by private individuals.[3] *Id.* at 340-47. Importantly, the Court concluded that free debate does *not* require such rigorous protection of private defamation, and instead gave states the broad authority to "define for themselves the appropriate standard of liability" for such actions, so long as "they do not impose liability without fault." *Id.* at 347. The baseline protection against strict liability was necessary, the Court explained, not because the First Amendment shields false statements as a general matter, but because such broad liability would threaten the operations of "*the press and broadcast media.*" *Id.* at 348 (emphasis added). In other words, the Court determined that "speech that matters," *id.* at 341—the presence of robust and functional news media—required some minimal protection against liability for publishing erroneous facts.

This same method of analysis—beginning from the presumption that false speech is unprotected and then determin-

---

[3]Specifically, the Court considered whether to extend the "actual malice" standard crafted in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), for defamation actions brought by public officials. I discuss *Sullivan infra* Part II.A.2.

ing whether some protection is needed for other speech that matters—has been often repeated. For example, in *Hustler Magazine v. Falwell*, the Court began by noting that "[f]alse statements of fact are particularly valueless." 485 U.S. at 52. From there, the Court considered whether the strong interest in public debate required some protection against intentional infliction of emotional distress claims brought by public officials. *Id.* at 52-54. After an extensive analysis, the Court announced its "considered judgment" that the pivotal role played by satire in "public and political debate," *id.* at 54, required the extension of an actual malice standard to such claims. *Id.* at 56-57. *See also BE & K Constr. Co. v. NLRB*, 536 U.S. 516, 531 (2002) (considering whether the freedom to bring unsuccessful lawsuits deserves "breathing space protection" under the First Amendment).

Our own court has followed the same pattern of analysis. Under the Supreme Court's guidance, we recognize that "false statements are not deserving, in themselves, of constitutional protection," and thus "constitutional protection is afforded [only] *some* false statements." *Johnson v. Multnomah Cnty.*, 48 F.3d 420, 424 (9th Cir. 1995) (emphasis added). Namely, we must consider "the interest in creating a 'breathing space' " for constitutionally protected speech. *Id.*

For example, in *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, we began by recognizing that the "[F]irst [A]mendment has not been interpreted to preclude liability for false statements." 690 F.2d 1240, 1261 (9th Cir. 1982). From there, we asked whether allowing antitrust liability for furnishing false information to an administrative body would impinge on other, constitutionally protected speech. Ultimately, we concluded that imposing such liability would not "hamper debate," and therefore that no heightened First Amendment protections applied. *See id.* at 1261-62. Moreover, we made clear that even where a restriction on false statements *will* hamper debate, "this possibility does not require that all such statements be immunized from liability."

*Id.* at 1262. Indeed, the protection of speech that matters may simply "suggest that a court should adopt a stricter standard of proof," not even that the most exacting level of scrutiny should be applied. *Id.*

2

In this case, the majority implied that the Supreme Court's long line of decisions applying the foregoing analysis is called into question by its earlier decision in *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). *See Alvarez*, 617 F.3d at 1203, 1206-08. Nothing could be further from the truth. *Sullivan* does not suggest that false statements, in and of themselves, receive constitutional protection. Quite the opposite, in *Sullivan* the Court engaged in precisely the analysis described above.

In *Sullivan*, the Court considered whether an elected commissioner of Montgomery, Alabama could bring a civil libel suit for defamatory comments contained in a full-page political advertisement. *Id.* at 256-57. Of the advertisement's ten paragraphs, only two contained statements that were allegedly false. *Id.* at 257. Rather than addressing whether false speech, as a category, is protected by the First Amendment, the Court asked whether the "*advertisement*, as an expression of grievance and protest on one of the major public issues of our time, . . . forfeits [First Amendment] protection by the falsity of *some of its factual statements*." *Id.* at 271 (emphasis added). Ultimately, the Court concluded that the presence of some erroneous statements did not forfeit all protections for the political advertisement as a whole. Because "erroneous statement is inevitable in free debate," in certain circumstances, it "must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.' " *Id.* at 271-72 (quoting *NAACP v. Button*, 371 U.S. at 415, 433 (1963)) (ellipsis in original). The Court noted that this is especially true in the unique "climate in which public officials operate." *Id.* at 273 n.14. Accordingly, the Court required a

heightened "actual malice" scienter for public officials seeking to bring defamation actions against their critics, specifically to buttress our "profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open." *Id.* at 270.

As described by the Supreme Court itself, *Sullivan* thus stands for the simple proposition that we must "protect *some falsehood* in order to protect *speech that matters*." *Gertz*, 418 U.S. at 341 (emphasis added) (discussing *Sullivan*). This is a far cry from the majority's opinion, which somehow concludes that "we presumptively protect all speech, including false statements." *Alvarez*, 617 F.3d at 1217 (emphasis omitted). The Court in *Sullivan* did not address the question whether false statements, as a category, are protected by the First Amendment.[4] *Sullivan*'s holding does not even apply to defamation actions against private individuals, nor does it extend First Amendment protections to *any* knowingly false speech, *see Garrison v. Louisiana*, 379 U.S. 64, 75 (1964) ("[T]he knowingly false statement and the false statement made with reckless disregard of the truth, do not enjoy constitutional protection.").

*Sullivan* is but one example of granting limited First Amendment protection to false statements *in order to* protect other, non-false speech that matters. *See BE & K Constr. Co.*, 536 U.S. at 531 (describing *Sullivan* as "[a]n example of . . . 'breathing space' protection" for speech that matters). And *Sullivan* therefore does not establish any rule that calls into question the Court's many subsequent statements that identify false speech as constitutionally unprotected.

---

[4]And the Court certainly did not address whether *all* speech is presumptively protected, as the majority opinion states. It is difficult to see how the majority could defend this more startling conclusion, given the multitude of Supreme Court cases stating emphatically that certain "categories of speech [are] *fully outside* the protection of the First Amendment." *United States v. Stevens*, 130 S. Ct. 1577, 1586 (2010) (emphasis added); *accord Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 (1961).

B

Altogether, upon consideration of both the Supreme Court's plain statements and the Court's underlying analysis, we are left with the conclusion that false statements of fact are not protected by the First Amendment, *unless it is shown* that other "speech that matters" requires such protection. Without more, restrictions upon false statements, as with other areas of unprotected speech, are simply not subject to strict scrutiny review. *See United States v. Stevens*, 130 S. Ct. 1577, 1585-86 (2010) ("[W]ithin [the] categories of unprotected speech . . . no process of case-by-case adjudication is required, because the balance of competing interests is clearly struck." (internal quotation marks omitted)). The majority never should have imposed such exacting standards upon the Stolen Valor Act.

III

Despite such overwhelming precedent, the majority somehow proclaims to "find *no authority* holding that false factual speech, as a general category unto itself, is [unprotected by the First Amendment]." *Alvarez*, 617 F.3d at 1206 (emphasis added). With that remarkable conclusion, the majority dove into strict scrutiny analysis after determining that the government had not rebutted the majority's self-imposed presumption of such scrutiny. The court never even considered whether the Stolen Valor Act will chill speech that matters, much less required Xavier Alvarez to demonstrate that it will.[5]

---

[5]In his post-opinion concurrence, Judge Smith insists that the government is required "to prove that the targeted speech is not . . . protected." Smith Concurrence at 3747. This is misleading. At most, the government bears the burden of showing that the speech targeted is *within a certain class* of unprotected speech; once that is shown, no further case-by-case analysis is needed, *see Stevens*, 130 S. Ct. at 1585-86. Here, there is no question that the Act criminalizes *only* false statements of fact. Such statements are categorically unprotected for their own sake—and it is then Alvarez's burden to demonstrate whether other First Amendment concerns require protection of the false statements at issue.

In so doing, the majority both rejected the Supreme Court's settled method of analysis and ignored the Court's clear language. As Judge Bybee put it, "[t]he majority . . . effectively overruled *Gertz* and inverted the whole scheme." *Id.* at 1223 (Bybee, J., dissenting). And, ultimately, the majority imposed burdens upon the Stolen Valor Act that are unsupported by, and are even directly contrary to, existing law.

A

1

Instead of recognizing that false speech is unprotected, the majority refused to give the Supreme Court's consistent and overwhelming precedent its full due. Instead, the majority "believe[s] the historical category of unprotected speech identified in *Gertz* and related law is *defamation*, not all false factual speech." *Alvarez*, 617 F.3d at 1207 (emphasis added). The majority thus analyzed the issue as whether it should "extend" this traditionally unprotected category of "defamation" to include false statements of fact more broadly. *Id.* at 1208.

But to accept the majority's reading of *Gertz* and its progeny, one must turn a deaf ear to the Supreme Court's language. Indeed, in the majority's view, each of the myriad times the Court referred to "false statements" generally, the Court misspoke. For instance, when the Court wrote that "the erroneous statement of fact is not worthy of constitutional protection," *Gertz*, 418 U.S. at 340, what it really meant (according to the majority) was "the erroneous statement of fact is not worthy of constitutional protection [only if it meets the traditional definition of defamation]." Or when the Court instructed that "false statements [are] unprotected for their own sake," *BE & K Constr. Co.*, 536 U.S. at 531, it actually meant (according to the majority) that "[slander and libel are] unprotected for their own sake."

It is not our place to put words into the mouth of the Supreme Court. Worse yet, it is not our place to take the

Supreme Court's actual words and reshape them to mean something entirely different. As Judge Bybee noted in dissent, the Supreme Court surely knows the difference between "defamation" and "false statements of fact." *See Alvarez*, 617 F.3d at 1223 (Bybee, J., dissenting). If it meant the former, presumably it would have said so. I cannot assume that the Court would have blithely used "false statements" to mean "defamation" for four decades running.

2

In reaching its constrained reading of *Gertz* and its progeny, the majority relies heavily on the Supreme Court's recent decision in *United States v. Stevens*. There, the Court considered whether graphic portrayals of violence to animals are entitled to protection under the First Amendment. Outlining the general framework for considering First Amendment challenges, the Court explained that certain "categories of speech [are] fully outside the protection of the First Amendment." *Stevens*, 130 S. Ct. at 1586. By way of illustration, the Court noted that these categories "includ[e] obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *Id.* at 1584 (citations omitted). The Court went on to reject the contention that depictions of animal cruelty were one such category, and thereafter to reject the argument that a new category for such depictions should be created.

The majority makes much of the fact that the Court in *Stevens* did not specifically name "false statements of fact" in its list of historically unprotected categories of speech. *See Alvarez*, 617 F.3d at 1208-09. The majority reads into that passage an implication that false statements are *not* historically unprotected. But, by its own terms, the Court's list of unprotected categories is not exhaustive. Even more, by stating that the categories of historically unprotected speech *include* the examples it named, the Court implied that other, unnamed classes of speech are unprotected as well. *See Burgess v. United States*, 553 U.S. 124, 131 n.3 (2008) (" '[T]he word

'includes' is *usually a term of enlargement*, and not of limitation.' " (emphasis added) (quoting 2A N. Singer & J. Singer, Sutherland on Statutory Construction § 47:7, at 305 (7th ed. 2007))). It is obvious that the Supreme Court's brief, illustrative list was in no way intended to call into question its decades of precedent explicitly stating that false statements of fact do not receive First Amendment protection.

Moreover, it is little surprise that the Supreme Court at times refers specifically to "defamation" as an unprotected category, given that many of the cases in this area concern defamatory statements.[6] *See, e.g.*, *Gertz*, 418 U.S. at 323; *Chaplinsky*, 315 U.S. at 568. But the Court's reference to the specific category of defamation in a given case has never been thought to refute the notion that the general category of false statements is unprotected. For example, in *Chaplinsky v. New Hampshire*, the Court listed the categories of historically unprotected speech as "the lewd and obscene, the profane, the *libelous*, and the insulting or 'fighting' words." *Chaplinsky*, 315 U.S. at 572 (emphasis added). But, directly quoting *Chaplinsky*, in *Gertz* the Court stated more broadly that "false statements of fact" are categorically unprotected. *Gertz*, 418 U.S. at 340. The fact that one of the Court's most recent statements on unprotected categories of speech did not expressly mention "false statements of fact" sheds little, if any, light on the historical protection of such speech.

### B

After dodging the Supreme Court's clear guidance, the majority mistakenly concludes that the only way for the

---

[6]Importantly, not *all* of the cases in this area deal with defamation—a point that cuts sharply against the majority's reading of *Gertz. See, e.g.*, *BE & K Constr. Co*, 536 U.S. 516 (retaliatory lawsuits); *Hustler Magazine*, 485 U.S. 46 (intentional infliction of emotional distress); *see also Alvarez*, 617 F.3d at 1224-27 (Bybee, J., dissenting) (collecting and discussing cases).

Stolen Valor Act to survive is if it requires a scienter above negligence and a showing of individualized harm. *See Alvarez*, 617 F.3d at 1207-14. According to the majority, these requirements are derived from those imposed upon regulations of defamation and fraud—the two categories of unprotected speech that the majority admits deal in false statements. But upon closer look at current laws, the majority's self-created requirements do not hold water. Moreover, even if we *were* to impose such requirements, the Stolen Valor Act still survives.

1

The litany of state and federal laws that prohibit false speech *without* a showing of individualized harm drastically undermine the majority's insistence that all regulations of false speech must require such a showing.[7] For example, Chapter 47 of Title 18 (named "Fraud and False Statements"), criminalizes a host of false statements, including many without any showing of harm (or even of "materiality")—and some which do not even contain a scienter requirement. *See, e.g.*, 18 U.S.C. § 1005 (punishing "any false entry in any book, report, or statement" of a bank); *id.* § 1011 (punishing "any [knowingly] false statement . . . relating to the sale of any mortgage, to any Federal land bank"); *id.* § 1015(a) (punishing "any [knowingly] false statement under oath, in any case, proceeding, or matter relating to . . . naturalization, citizenship, or registry of aliens"); *id.* § 1027 (punishing "any [knowingly] false statement or representation of fact . . . required by [ERISA]"). The Supreme Court has rejected the contention that these statutes implicitly require a showing of

---

[7]Moreover, the failure of these laws to comply with the majority's self-created requirements suggests that prohibitions of false speech have not been constrained to traditional definitions of "fraud" or "defamation." I certainly do not agree, as Judge Smith assumes, Smith Concurrence at 3751, that these laws are constitutional only because they fit within such categories as listed in *Stevens*.

materiality or harm—and yet the Court did not even consider whether the absence of such a requirement raised First Amendment concerns. *See United States v. Wells*, 519 U.S. 482 (1997). And the federal government is far from alone; a quick survey of but a few states within our own circuit underscores just how prevalent prohibitions of false statements are, even without individual harm requirements. *See, e.g.*, Alaska Stat. § 11.56.800(a)(2) (punishing "false report[s] to a peace office that a crime has occurred or is about to occur"); Ariz. Rev. Stat. § 13-2907.03 (punishing a knowingly "false report of sexual assault involving a spouse"); Nev. Rev. Stat. § 199.145 (punishing any willful "unqualified statement of that which the person does not know to be true" made under oath); Rev. Code Wash. § 9A.60.070 (punishing knowingly false claims of "a credential issued by an institution of higher education that is accredited," in promotion of a business or with the intent to obtain employment).

It is thus neither out of the ordinary nor constitutionally significant that the Stolen Valor Act does not require a showing of individualized harm.

2

Even if we were to require the Stolen Valor Act to contain the majority's self-created requirements, the Act would still stand. First, even accepting the need for some scienter above negligence, it is clearly met here.[8] Although the Act does not explicitly contain a scienter requirement, Alvarez readily admits that he knew his statement was a lie when he uttered it. *See Alvarez*, 617 F.3d at 1201. Thus, at least as-applied to Alvarez, the statute's lack of a scienter requirement is of no

---

[8]Although the majority implied that, to survive, the Act must require a "malicious" or "knowingly false" scienter along the lines of *Sullivan*, *Alvarez* 617 F.3d at 1209, it is difficult to understand why such a strict scienter would be required here, while it is not even required in defamation actions brought by non-public figures, *see Gertz* 418 U.S. at 343-50.

moment. Moreover, in seemingly every case that would be prosecuted under the Act, the speaker will know the falsity of his statement. It is difficult to imagine a scenario in which a speaker honestly believes that he has been awarded a military honor that he has not actually received. To the extent that any such case would arise, it surely would be the rare exception. Thus, the lack of a scienter requirement carries no weight even under Alvarez's facial challenge. That challenge may succeed only if "no set of circumstances exists under which the Act would be valid."[9] *United States v. Salerno*, 481 U.S. 739, 745 (1987).

Second, even if it were necessary, a requirement that the Act criminalize only statements that effect some harm is easily satisfied. Indeed, Congress has identified the harm at issue: "[f]raudulent claims surrounding the receipt of . . . [military] decorations and medals awarded by the President or the Armed Forces of the United States damage the reputation and meaning of such decorations and medals." Stolen Valor Act of 2005, Pub. L. No. 109-437, § 2(1), 120 Stat. 3266 (2006). The majority admits that "Congress certainly has an interest, even a compelling interest" in preventing such harm. *Alvarez*, 617 F.3d at 1216. That the Act does not explicitly limit its scope only to those false statements that incur this congressionally identified harm is inconsequential; the underlying point is that *all* such statements contribute to the harm. *See also Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 776 (1984) ("False statements of fact harm both the subject of the falsehood and the readers of the statement." (emphasis removed)). "The fact that a congressional directive reflects unprovable assumptions about what is good for the people, including imponderable aesthetic assumptions, is not a sufficient reason

---

[9]Similarly, the Act's lack of a scienter requirement does not render the statute overbroad, which would require its unconstitutional sweep to be "*substantial* . . . [when] judged in relation to the statute's plainly legitimate sweep." *Broadrick v. Oklahoma*, 413 U.S. 601, 615 (1973) (emphasis added).

to find that statute unconstitutional." *Paris Adult Theatre I v. Slaton*, 413 U.S. 49, 62 (1973).

It is difficult to see how reputational harm to the military even could be evaluated on an individual basis, and it is no surprise that the Act has not made such a showing an element of the offense. The Act's general harm provision is both sensible and sufficient. Neither the Constitution nor the Supreme Court has required anything more specific.[10]

IV

Finally, how should one address the bleak dystopia hypothesized by Chief Judge Kozinski? In his view, if we are to take the Supreme Court at its word that false statements of fact are unprotected by the First Amendment, then a variety of white lies, exaggerations, and cosmetic enhancements—and apparently the core of self-expression itself—must fall. See Kozinski Concurrence at 3756-59. Such fears are wholly unfounded and miss the very crux of my disagreement with the majority.

As an initial matter, most of the "lies" that Chief Judge Kozinski postulates are not false statements of fact whatsoever. They are opinions ("Gee you've gotten skinny;" "She's just a friend;" "I just haven't met the right woman;" "I'm sooo lucky to have a smart boss like you;" "I had too much to drink;" "You're the greatest living jurist"); expressions of emotion or sensation ("I love opera;" "But I love you *so* much;" "It's not you, it's me;" "My back hurts;" "I've got a headache"); predictions or plans ("[I]t won't hurt a bit;" "I'll

---

[10]Indeed, 18 U.S.C. § 1001—the leading federal prohibition on false statements—was vastly expanded following the New Deal, out of Congress's recognition that certain false statements would impair government functioning "*even though* the government would not be deprived of any property or money." *Brogan v. United States*, 522 U.S. 398, 412 (1998) (Ginsburg, J., concurring) (emphasis added). This, like the Stolen Valor Act, is but one example of Congress's authority to prohibit false speech based upon general, perhaps unprovable, assumptions about public good.

call you about lunch"); exaggerations ("We go way back"); and playful fancy ("There are eight tiny reindeer on the rooftop"). Kozinski Concurrence at 3756, 3758-59. Even if these were to be described—under the loosest possible definition—as statements of fact, they would hardly be falsifiable. Such statements thus are not even implicated by the foregoing discussion of the protections afforded false statements of fact. *See generally Alvarez*, 617 F.3d at 1220-23 (Bybee, J., dissenting) (outlining the contours of false statements, as defined by the Supreme Court).

More importantly, Chief Judge Kozinski appears to have misunderstood my fundamental disagreement with the majority. That false statements of fact are always *unprotected* in themselves is not to say that such statements are always *subject to prohibition*. Quite to the contrary, as I have discussed at length, false statements may often *not* be prohibited, where it is shown that other, constitutionally protected speech will be stifled as well. For example, Chief Judge Kozinski identifies "[p]olitical and self expression" as "at the very heart of the First Amendment." Kozinski Concurrence at 3763. And false statements could not uniformly be prohibited without regard to the effect on such forms of expression. But the problem here—and the reason that this case deserves to be reheard en banc—is that the majority never even *asked* whether speech such as political or self-expression would be harmed by the Stolen Valor Act before diving into strict scrutiny analysis.[11]

---

[11]Judge Smith now suggests that the need to protect "speech that matters" is an illusory restraint on the government. *See* Smith Concurrence at 3755 (questioning what sorts of speech "matter" and suggesting that lies would be subject to "ever-expanding" prohibition). But, as has been discussed, the Supreme Court has indeed restricted the prohibition of some false statements in the interest of political expression and public debate. *See supra* Part II.A. Judge Kozinski's "Kafkaesque world," Smith Concurrence at 3755, suggests that personal self-expression may require similar protection in some cases. In short, there are many areas of speech that matter which may require protection in a given case, but the court must actually *address* such areas in order to give the safeguard teeth.

Like a Hollywood horror film, Chief Judge Kozinski describes a fictional world that may frighten, but which is far removed from the one in which we actually live.

V

Because the majority has strayed from the Supreme Court's clear guidance—and in the process has taken this court's First Amendment jurisprudence along for the ride—I must respectfully dissent from our court's regrettable failure to rehear this case en banc.

---

GOULD, Circuit Judge, dissenting from denial of rehearing en banc:

I respectfully dissent from denial of rehearing en banc. Although I agree with the suggestions of Judge O'Scannlain and Judge Bybee in their respective dissents that the majority in *Alvarez* is in tension with Supreme Court holdings in *Gertz* and *Garrison,* I would emphasize a different approach in my preferred form of analysis. I do not feel that sustaining Congress's Stolen Valor Act turns on the scope of a sentence from the Supreme Court in any one particular case, whether *Gertz*, or *Garrison*, or *Stevens*. Nor does it require that we say that all false statements are not deserving of First Amendment protection. Rather, I stress that the military context, in which the power of Congress is necessarily strong, together with the lack of any societal utility in tolerating false statements of military valor such as those made by Alvarez, which steal or dilute significant honors bestowed on military heroes, counsel that it's improper to apply strict scrutiny to invalidate this law on its face.

I do not doubt that some statements of the Supreme Court in other cases, read by the *Alvarez* majority to apply here, have contributed to the majority's reasoning. That is, of

course, the common law method, and even dicta from the Supreme Court warrants respect. *See, e.g.*, *Coeur D'Alene Tribe v. Hammond*, 384 F. 3d 674, 683 (9th Cir. 2004) (stating that Supreme Court dicta is entitled to "great weight")*; Official Comm. of Unsecured Creditors of Cybergenics Corp. ex rel. Cybergenics Corp. v. Chinery*, 330 F. 3d 548, 561 (3d Cir. 2003) (en banc) ("Although . . . the Supreme Court's dicta are not binding on us, we do not view it lightly."). But here, both sides to the controversy can find sentences in prior opinions to use in aid of their theories of the case. Moreover, statements in prior opinions, regardless of potential utility in a current dispute, cannot properly be interpreted as absolutely binding in cases involving different types of facts not present in a previous case decided by the Supreme Court.

It remains open for the Supreme Court to clarify its First Amendment law in the context of Alvarez's challenge to the Stolen Valor Act. For my part, I would distinguish cases with language cutting a different way, while viewing the crux of the issue as this: A rational Congress might think that the quality of military service and instances of award winning heroism will be enhanced to the extent that there aren't false claims of entitlement to military honors. This interest is a powerful one that a federal court should hesitate to diminish by outlawing the controlling statute on its face. Conversely, Alvarez has no substantial personal interest in lying about his military record, nor is there any substantial societal interest served by letting Alvarez lie about earning awards that he did not receive. I would hold that Congress's criminalization of making false statements about receiving miliary honors is a "carefully defined" subset of false factual statements not meriting constitutional protection. *See United States v. Alvarez*, 617 F.3d 1198, 1213 (9th Cir. 2010). Stated another way, there should be no conclusion of unconstitutionality even on the standard framed by the majority opinion. To uphold this statute would not necessarily remove all false statements in all contexts from First Amendment scrutiny.

The interests of society at stake counsel us to apply a more permissive standard than the compelling state interest test when assessing the Stolen Valor Act and to uphold it in whole or part if possible. It would be too much to say that any speech by any person about military affairs would fall outside the First Amendment's purview, for that inescapably would lead us to approve sedition acts and criminal prosecutions of those who criticize wars or military conduct. However, Alvarez was not criticizing actions of the military, he was just lying about his military history. Given the military context impelling Congress and the lack of substantial interest of Alvarez or society in his falsehood, the Stolen Valor Act should be sustained against Alvarez's First Amendment challenge. We could leave for another day whether an as applied challenge might be permissible on other facts.

Hence I respectfully dissent.