Justice Breyer,
with whom Justice Kagan joins, concurring in the judgment.
I agree with the plurality that the Stolen Valor Act of 2005 violates the First Amendment. But I do not rest my conclusion upon a strict categorical analysis. Ante, at 717-722. Rather, I base that conclusion upon the fact that the statute works First Amendment harm, while the Government can achieve its legitimate objectives in less restrictive ways.
I
In determining whether a statute violates the First Amendment, this Court has often found it appropriate to examine the fit between statutory ends and means. In doing so, it has examined speech-related harms, justifications, and potential alternatives. In particular, it has taken account of the seriousness of the speech-related harm the provision will likely cause, the nature and importance of the provision’s countervailing objectives, the extent to which the provision will tend to achieve those objectives, and whether there are other, less restrictive ways of doing so. Ultimately the Court has had to determine whether the statute works speech-related harm that is out of proportion to its justifications.
Sometimes the Court has referred to this approach as “intermediate scrutiny,” sometimes as “proportionality” review, sometimes as an examination of “fit,” and sometimes it has avoided the application of any label at all. See, e. g., Turner Broadcasting System, Inc. v. FCC, 512 U. S. 622, 641-652 (1994) (intermediate scrutiny); Randall v. Sorrell, 548 U. S. *731 230, 249 (2006) (plurality opinion) (proportionality); Board of Trustees of State Univ. of N. Y. v. Fox, 492 U. S. 469, 480 (1989) (requiring a “fit” between means and ends that is “ ‘in proportion to the interest served’ ”); In re R. M. J., 455 U. S. 191, 203 (1982) (“[Interference with speech must be in proportion to the [substantial governmental] interest served”); Pickering v. Board of Ed. of Township High School Dist. 205, Will Cty., 391 U. S. 563, 568 (1968).
Regardless of the label, some such approach is necessary if the First Amendment is to offer proper protection in the many instances in which a statute adversely affects constitutionally protected interests but warrants neither near-automatic condemnation (as “strict scrutiny” implies) nor near-automatic approval (as is implicit in “rational basis” review). See, e. g., Turner Broadcasting System, Inc., supra, at 641-652 (“must-carry” cable regulations); Central Hudson Gas & Elec. Corp. v. Public Serv. Comm’n of N. Y., 447 U. S. 557, 566 (1980) (nonmisleading commercial speech); Burdick v. Takushi, 504 U. S. 428, 433-434 (1992) (election regulation); Pickering, supra, at 568 (government employee speech); United States v. O’Brien, 391 U. S. 367, 377 (1968) (application of generally applicable laws to expressive conduct). I have used the term “proportionality” to describe this approach. Thompson v. Western States Medical Center, 535 U. S. 357, 388 (2002) (dissenting opinion); see also Bartnicki v. Vopper, 532 U. S. 514, 536 (2001) (concurring opinion); Nixon v. Shrink Missouri Government PAC, 528 U. S. 377, 402-403 (2000) (concurring opinion). But in this case, the Court’s term “intermediate scrutiny” describes what I think we should do.
As the dissent points out, “there are broad areas in which any attempt by the state to penalize purportedly false speech would present a grave and unacceptable danger of suppressing truthful speech.” Post, at 751 (opinion of Alito, J.). Laws restricting false statements about philosophy, religion, history, the social sciences, the arts, and the like raise *732 such concerns, and in many contexts have called for strict scrutiny. But this case does not involve such a law. The dangers of suppressing valuable ideas are lower where, as here, the regulations concern false statements about easily verifiable facts that do not concern such subject matter. Such false factual statements are less likely than are true factual statements to make a valuable contribution to the marketplace of ideas. And the government often has good reasons to prohibit such false speech. See infra, at 734-736 (listing examples of statutes and doctrines regulating false factual speech). But its regulation can nonetheless threaten speech-related harms. Those circumstances lead me to apply what the Court has termed “intermediate scrutiny” here.
II
A
The Stolen Valor Act makes it a crime “falsely” to “repre-sen[t]” oneself “to have been awarded any decoration or medal authorized by Congress for the Armed Forces of the United States.” 18 U. S. C. § 704(b). I would read the statute favorably to the Government as criminalizing only false factual statements made with knowledge of their falsity and with the intent that they be taken as true. See Staples v. United States, 511 U. S. 600, 605 (1994) (courts construe statutes “in light of the background rules of the common law,... in which the requirement of some mens rea for a crime is firmly embedded”); cf. New York Times Co. v. Sullivan, 376 U. S. 254, 279-280 (1964) (First Amendment allows a publie official to recover for defamation only upon a showing of “ ‘actual malice’”). As so interpreted the statute covers only lies. But although this interpretation diminishes the extent to which the statute endangers First Amendment values, it does not eliminate the threat.
I must concede, as the Government points out, that this Court has frequently said or implied that false factual state *733 ments enjoy little First Amendment protection. See, e. g., BE&K Constr. Co. v. NLRB, 536 U. S. 516, 531 (2002) (“[F]alse statements may be unprotected for their own sake”); Hustler Magazine, Inc. v. Falwell, 485 U. S. 46, 52 (1988) (“False statements of fact are particularly valueless”); Gertz v. Robert Welch, Inc., 418 U. S. 323, 340 (1974) (“[T]he erroneous statement of fact is not worthy of constitutional protection”).
But these judicial statements cannot be read to mean “no protection at all.” False factual statements can serve useful human objectives, for example: in social contexts, where they may prevent embarrassment, protect privacy, shield a person from prejudice, provide the sick with comfort, or preserve a child’s innocence; in public contexts, where they may stop a panic or otherwise preserve calm in the face of danger; and even in technical, philosophical, and scientific contexts, where (as Socrates’ methods suggest) examination of a false statement (even if made deliberately to mislead) can promote a form of thought that ultimately helps realize the truth. See, e. g., 638 F. 3d 666, 673-675 (CA9 2011) (Kozinski, J., concurring in denial of rehearing en banc) (providing numerous examples); S. Bok, Lying: Moral Choice in Public and Private Life (1999) (same); New York Times Co., supra, at 279, n. 19 (“Even a false statement may be deemed to make a valuable contribution to public debate, since it brings about ‘the clearer perception and livelier impression of truth, produced by its collision with error’” (quoting J. Mill, On Liberty 15 (Blackwell ed. 1947))).
Moreover, as the Court has often said, the threat of criminal prosecution for making a false statement can inhibit the speaker from making true statements, thereby “chilling” a kind of speech that lies at the First Amendment’s heart. See, e. g., Gertz, supra, at 340-341. Hence, the Court emphasizes mens rea requirements that provide “breathing room” for more valuable speech by reducing an honest speaker’s fear that he may accidentally incur liability for speaking.
*734 Further, the pervasiveness of false statements, made for better or for worse motives, made thoughtlessly or deliberately, made with or without accompanying harm, provides a weapon to a government broadly empowered to prosecute falsity without more. And those who are unpopular may fear that the government will use that weapon selectively, say, by prosecuting a pacifist who supports his cause by (falsely) claiming to have been a war hero, while ignoring members of other political groups who might make similar false claims.
I also must concede that many statutes and common-law doctrines make the utterance of certain kinds of false statements unlawful. Those prohibitions, however, tend to be narrower than the statute before us, in that they limit the scope of their application, sometimes by requiring proof of specific harm to identifiable victims; sometimes by specifying that the lies be made in contexts in which a tangible harm to others is especially likely to occur; and sometimes by limiting the prohibited lies to those that are particularly likely to produce harm.
Fraud statutes, for example, typically require proof of a misrepresentation that is material, upon which the victim relied, and which caused actual injury. See Restatement (Second) of Torts § 525 (1976). Defamation statutes focus upon statements of a kind that harm the reputation of another or deter third parties from association or dealing with the victim. See id., §§ 558, 559. Torts involving the intentional infliction of emotional distress (like torts involving placing a victim in a false light) concern falsehoods that tend to cause harm to a specific victim of an emotional-, dignitary-, or privacy-related kind. See id., § 652E.
Perjury statutes prohibit a particular set of false statements—those made under oath—while requiring a showing of materiality. See, e. g., 18 U. S. C. § 1621. Statutes forbidding lying to a government official (not under oath) are typically limited to circumstances where a lie is likely to work *735 particular and specific harm by interfering with the functioning of a government department, and those statutes also require a showing of materiality. See, e. g., § 1001.
Statutes prohibiting false claims of terrorist attacks, or other lies about the commission of crimes or catastrophes, require proof that substantial public harm be directly foreseeable, or, if not, involve false statements that are very likely to bring about that harm. See, e. g., 47 CFR § 73.1217 (2011) (requiring showing of foreseeability and actual substantial harm); 18 U. S. C. § 1038(a)(1) (prohibiting knowing false statements claiming that terrorist attacks have taken, are taking, or will take, place).
Statutes forbidding impersonation of a public official typically focus on acts of impersonation, not mere speech, and may require a showing that, for example, someone was deceived into following a “course [of action] he would not have pursued but for the deceitful conduct.” United States v. Lepowitch, 318 U. S. 702, 704 (1943); see, e. g., § 912 (liability attaches to “[wjhoever falsely assumes or pretends to be an officer or employee acting under the authority of the United States . . . and acts as such” (emphasis added)).
Statutes prohibiting trademark infringement present, perhaps, the closest analogy to the present statute. Trademarks identify the source of a good; and infringement causes harm by causing confusion among potential customers (about the source) and thereby diluting the value of the mark to its owner, to consumers, and to the economy. Similarly, a false claim of possession of a medal or other honor creates confusion about who is entitled to wear it, thus diluting its value to those who have earned it, to their families, and to their country. But trademark statutes are focused upon commercial and promotional activities that are likely to dilute the value of a mark. Indeed, they typically require a showing of likely confusion, a showing that tends to ensure that the feared harm will in fact take place. See 15 U. S. C. § 1114(1)(a); KP Permanent Make-Up, Inc. v. Lasting Im *736 pression I, Inc., 543 U. S. 111, 117 (2004); see also San Francisco Arts & Athletics, Inc. v. United States Olympic Comm., 483 U. S. 522, 539-540, 548 (1987) (upholding statute giving the United States Olympic Committee the right to prohibit certain commercial and promotional uses of the word “Olympic”).
While this list is not exhaustive, it is sufficient to show that few statutes, if any, simply prohibit without limitation the telling of a lie, even a lie about one particular matter. Instead, in virtually all these instances limitations of context, requirements of proof of injury, and the like, narrow the statute to a subset of lies where specific harm is more likely to occur. The limitations help to make certain that the statute does not allow its threat of liability or criminal punishment to roam at large, discouraging or forbidding the telling of the lie in contexts where harm is unlikely or the need for the prohibition is small.
The statute before us lacks any such limiting features. It may be construed to prohibit only knowing and intentional acts of deception about readily verifiable facts within the personal knowledge of the speaker, thus reducing the risk that valuable speech is chilled. Supra, at 732-733. But it still ranges very broadly. And that breadth means that it creates a significant risk of First Amendment harm. As written, it applies in family, social, or other private contexts, where lies will often cause little harm. It also applies in political contexts, where although such lies are more likely to cause harm, the risk of censorious selectivity by prosecutors is also high. Further, given the potential haziness of individual memory along with the large number of military awards covered (ranging from medals for rifle marksmanship to the Congressional Medal of Honor), there remains a risk of chilling that is not completely eliminated by mens rea requirements; a speaker might still be worried about being prosecuted for a careless false statement, even if he does not have the intent required to render him liable. And so the *737 prohibition may be applied where it should not be applied, for example, to barstool braggadocio or, in the political arena, subtly but selectively to speakers that the Government does not like. These considerations lead me to believe that the statute as written risks significant First Amendment harm.
B
Like both the plurality and the dissent, I believe the statute nonetheless has substantial justification. It seeks to protect the interests of those who have sacrificed their health and life for their country. The statute serves this interest by seeking to preserve intact the country’s recognition of that sacrifice in the form of military honors. To permit those who have not earned those honors to claim otherwise dilutes the value of the awards. Indeed, the Nation cannot fully honor those who have sacrificed so much for their country’s honor unless those who claim to have received its military awards tell the truth. Thus, the statute risks harming protected interests but only in order to achieve a substantial countervailing objective.
C
We must therefore ask whether it is possible substantially to achieve the Government’s objective in less burdensome ways. In my view, the answer to this question is “yes-” Some potential First Amendment threats can be alleviated by interpreting the statute to require knowledge of falsity, etc. Supra, at 732-733. But other First Amendment risks, primarily risks flowing from breadth of coverage, remain. Supra, at 733-734, 736 and this page. As is indicated by the limitations on the scope of the many other kinds of statutes regulating false factual speech, supra, at 734-736, it should be possible significantly to diminish or eliminate these remaining risks by enacting a similar but more finely tailored statute. For example, not all military awards are alike. Congress might determine that some warrant greater pro *738 tection than others. And a more finely tailored statute might, as other kinds of statutes prohibiting false factual statements have done, insist upon a showing that the false statement caused specific harm or at least was material, or focus its coverage on lies most likely to be harmful or on contexts where such lies are most likely to cause harm.
I recognize that in some contexts, particularly political contexts, such a narrowing will not always be easy to achieve. In the political arena a false statement is more likely to make a behavioral difference (say, by leading the listeners to vote for the speaker), but at the same time criminal prosecution is particularly dangerous (say, by radically changing a potential election result) and consequently can more easily result in censorship of speakers and their ideas. Thus, the statute may have to be significantly narrowed in its applications. Some lower courts have upheld the constitutionality of roughly comparable but narrowly tailored statutes in political contexts. See, e. g., United We Stand America, Inc. v. United We Stand, America New York, Inc., 128 F. 3d 86, 93 (CA2 1997) (upholding against First Amendment challenge application of Lanham Act to a political organization); Treasurer of the Committee to Elect Gerald D. Lostracco v. Fox, 150 Mich. App. 617, 389 N. W. 2d 446 (1986) (upholding under First Amendment statute prohibiting campaign material falsely claiming that one is an incumbent). Without expressing any view on the validity of those cases, I would also note, like the plurality, that in this area more accurate information will normally counteract the lie. And an accurate, publicly available register of military awards, easily obtainable by political opponents, may well adequately protect the integrity of an award against those who would falsely claim to have earned it. See ante, at 729. And so it is likely that a more narrowly tailored statute combined with such information-disseminating devices will effectively serve Congress’ end.
*739 The Government has provided no convincing explanation as to why a more finely tailored statute would not work. In my own view, such a statute could significantly reduce the threat of First Amendment harm while permitting the statute to achieve its important protective objective. That being so, I find the statute as presently drafted works disproportionate constitutional harm. It consequently fails intermediate scrutiny, and so violates the First Amendment.
For these reasons, I concur in the Court’s judgment.